PARISH ET AL. *v.* MARYLAND AND VIRGINIA
MILK PRODUCERS ASSOCIATION, INC.
ET AL.

[No. 246, September Term, 1970.]

*Decided May 5, 1971.*

*Joint motion for rehearing filed June 3, 1971; denied June 4, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Herbert M. Brune,* with whom were *Brune, Robertson & Iglehart* on the brief, for appellants Wharff and Wenger. Frank P. Parish, in proper person, with whom was Theodore F. Parish on the brief, for appellants Frank P. Parish et ux.

*William O. Bittman,* with whom were *Stuart Philip Ross* and *Hogan & Hartson* on the brief, for appellee Directors. *Edward L. Merrigan,* with whom were *Smathers & Merrigan, Robert L. Burchett* and *Miller, Miller & Canby* on the brief, for appellee Maryland and Virginia Milk Producers Association, Inc. *M. Peter Moser,* with whom were *William B. Somerville* and *John J. Kenny* on

the brief, for appellees Robert M. Goldman and J. Robert Sherwood, Executors of the estate of Arthur V. Robinson. *Ivan J. Shefferman*, with whom were *Sachs, Greenebaum, Frohlich & Shefferman* on the brief, for appellee William B. Hooper. *Albert E. Brault* for appellee Wayne Kendrick.

MCWILLIAMS, J., delivered the opinion of the Court.

The principal question before us is whether the judgment of the chancellor, Moore, J., in the light of Maryland Rule 886, is clearly erroneous. Resolving that question was as arduous as stating it was easy. The events which provoked this litigation were set in motion early in 1954. The original bill of complaint, however, was not filed until February 1965. The second amended bill of complaint was filed in July of that year. The third amended bill of complaint (and its accompanying exhibits) was filed on 28 February 1967 and on 29 March the chancellor, Pugh, J., sustained the demurrers of the defendants. In *Parish v. Maryland and Virginia Milk Producers Ass'n, Inc.*, 250 Md. 24, 107 (1968), we reversed his order and remanded the case for further proceedings.

Judge Barnes, who wrote (74 pages) for the Court in *Parish*, thought the third amended bill of complaint (the bill) "with its eight exhibits * * * a rather formidable document," consisting of "84 printed pages." No less formidable is the transcript of the record which has come back to us from the Circuit Court for Montgomery County. The docket entries take up 28 printed pages. They show that the chancellor held no less than 15 hearings on motions of one kind or another and that the trial on the merits went on without interruption for four weeks. The transcript weighs over 100 pounds; the record extract and the briefs occupy in excess of 3,000 printed pages; a dozen or more pleadings (over 100 typewritten pages) have been filed since the oral arguments.

Because Judge Barnes has provided us with a full dis-

cussion and explanation of the bill, the exhibits, the identity of the parties, and the many allegations and charges set forth in the bill, we shall limit our comments in this regard to the few changes which have taken place since. (At this point, of course, one ought to lay aside this opinion and read carefully what Judge Barnes has said in *Parish* beginning with page 34 and continuing through page 71.) On 5 November 1969 the bill was further amended by the addition of new paragraph No. 28;[1] the prayers for relief were amended by the addition of para-

---

1. "28. (A). That an actual and a justiciable controversy exists between the Complainants and the Defendants, and particularly the Defendant Association, on a number of issues, one of which is the legal relationship between the parties and the duties that flow therefrom.

"(B). That the Defendant Association is a non-profit, non-stock corporation which has, pursuant to its Articles of Incorporation and By-Laws (Exhibit C) and Complainants' Contracts (in form of Exhibits A and B) taken possession and control of milk produced by its members, handled, processed, and marketed the same, etc. for the benefit of its members, and is still doing so. The Defendant Association has possession, control and legal title to money, personal and real property acquired by withholding and investing net proceeds from the sale of members' milk, which property is held for the benefit of its members including Complainants in shares unknown to them.

"(C). That the relationship between the Complainants and said other members, and Defendant Association, is one of Trustee and Beneficiary, involving a fiduciary duty by the Trustee and Co-Trustees to account and disclose voluntarily to the Beneficiaries all they know or that has come to their attention which may be material to the Beneficiaries for the protection of their interests.

"(D). That Defendant Association in its Answer to the Third Amended Bill of Complaint denies the existence of a trust relationship.

"(E). That the request for a declaratory judgment is necessary in that the determination of a trust relationship is basic and fundamental to the determination of the many questions raised in this case, and to assure that major wrongs still concealed will not become res adjudicata.

"(F). That the Complainants, and each of them, are members and representatives of the entire class of milk producers of the Association, and as such are entitled to maintain this class action as beneficiaries of a trust, namely, the Maryland and Virginia Milk Producers Association, Inc., incorporated and operated exclusively for the benefit of its members constituting said class, to recover on behalf of the said trustee and the members of the said class any and all money and property arising out of the matters hereinbefore alleged in this Complaint."

graphs 4A, 4B and 4C.[2] Wayne E. Lenn, Edwin R. Lenn, J. A. B. Dahlgren, and E. Irving Eldridge were allowed to withdraw as parties plaintiff.[3] The number of defendants was increased by service on 12 additional directors, William B. Hooper, a former officer of the Association, and Wayne Kendrick, its former auditor. Frank Parish was dismissed as a party plaintiff by the order of 3 October 1969, from which order he has appealed.

The trial on the merits was concluded on 19 November 1969. The chancellor heard arguments of counsel on 16 December and on 5 January 1970 he gave orally in open court his reasons for dismissing the bill. This able and comprehensive opinion occupies 30 printed pages of the record extract. We shall make liberal use of it. The final decree was filed on 15 January. All petitions for a rehearing were dismissed and this appeal followed.

The Maryland and Virginia Milk Producers Associa-

---

2. "4A. Complainants respectfully pray for declaratory judgment that under the conditions recited hereinbefore in the Twenty-Eighth paragraph, the legal relationship of the Defendant Association to its members is that of Trustee and Beneficiary and, accordingly, the Defendant Association is under such fiduciary duty of a Trustee to voluntarily account to and disclose to its member Beneficiaries all pertinent matters pertaining to all transactions by the Defendant Association in connection with its handling, processing, and marketing, etc., of the milk produced by its member beneficiaries and to render a financial accounting to its Beneficiaries for the proceeds and considerations received by it in the marketing of said milk and all by-products thereof.

"4B. That this Honorable Court enter a Decree declaring that the legal relationship of the Defendant Association and its members and producers who have shipped milk to it was and is, respectively, that of trustee and beneficiary.

"4C. That this Honorable Court enter a Decree that any and all funds or property recovered by the Defendant Association in this suit shall be accounted for by the Defendant Association to that class of its membership represented by the Complainants in such amounts and proportions as this Honorable Court might determine, in accordance with the respective rights of the members of said class as beneficiaries of the trust described in Paragraph 28 of this Amended Third Amended Bill of Complaint."

3. Four others—the Main brothers, Eader and Lowman—were allowed to intervene as parties plaintiff. Some months later they were allowed to withdraw, not without opposition by Wharff and Wenger, however.

tion, Inc. (Association), is a farm cooperative organized and functioning as such under Code (1966 Repl. Vol.), Art. 23, § 349. For the past half century it has been engaged in the collective marketing of milk and milk products for its members. They are the family and corporate farming entities who ship their milk to the Association. As the chancellor put it:

"* * * [T]his has been overall a successful organization. From very humble beginnings in the early '30's in a small office in Washington, * * * with a gross business * * * in the neighborhood of $20 million a year * * * it has become a large organization * * * with a vast force of over 200 employees, with members aggregating 1100 in number and doing a gross volume of $50 million a year.

"Over the years this association has responded to an urgent need, a public interest, the interest of the consumers of this area. They have succeeded in establishing at Laurel, according to the evidence here—and the complainants do not by any means cast any doubt upon this in their testimony nor argument—they have established at Laurel, Maryland, a manufacturing plant for milk and milk products which is a model for such plants in this country, and, indeed, throughout the world."

Dean Dugan, about whom we shall say more later on, thought that the Laurel Plant "was operated in a highly efficient manner and that it returned extraordinary gains to the Association."

The affairs of the Association are managed by 21 directors each of whom is elected at local district meetings of the members. The districts are located in Maryland, Virginia, West Virginia and Pennsylvania. The elections are ratified at the annual meeting of the entire membership. Each director receives $25 per meeting to reimburse him for the cost of attending. The chancellor com-

mented that the directors are farmers and producers and that none of them "personally profited from any of the transactions complained of." He went on to say:

"[We have] been impressed with the testimony of the directors who have appeared here and testified on the witness stand, impressed with these directors' integrity, with their industry, and, of course, with the fact, basically, that being producers their principal motivation, their own self-interest is furthered and fostered by the success and prosperity of the Association.

"We think, also, that they have been in capable hands insofar as expert assistance is concerned. These gentlemen, who are farmers, have not relied upon their own resources insofar as their business decisions are concerned, although in this wise, too, some of them are bank directors and some are businessmen as well as farmers, and in these particular instances they have resorted to their own knowledge and experience.

"By and large, these men have been producing farmers who have, when the occasion needed it, and it seems to have been rather frequent in the history we have been studying, when they needed expert advice — and the court is impressed with the fact—they obtained the most expert advice available. They did not rely upon their own judgment in areas where expertise was required."

There are three main committees of the board of directors. The Finance Committee has jurisdiction over all matters relating to expenditures by the Association and oversees the handling of all Association monies. The Plant Committee, created when the Association acquired Embassy Dairy (Embassy) in 1954, is charged with the supervision of the Association's retail operation and its manufacturing plants. The Executive Committee is a policy body which deals with whatever may be assigned

to it by the directors. There are other committees but the three just mentioned are the most important ones. The board holds regularly scheduled monthly meetings, as do the Plant and Finance committees; as a rule they schedule their meetings to be held just before the board meetings. Full minutes are kept of all committee and board meetings. All matters are initially referred to a committee for study. The committees report to the full board with recommendations. In each instance of mismanagement by the directors, as here alleged, this system of study and recommendation was followed. The Secretary-Treasurer-General Manager is the ranking managing officer of the Association. He is directly responsible to the directors for all aspects of the Association's operations and for the performance of all employees. To keep the membership fully informed the Association publishes a monthly newsletter and each year distributes an annual report. Both are sent to all members. Additionally, local meetings are held in each district and an annual membership meeting is held in the spring.

There are three operating divisions. The Fluid Milk Division is concerned with the retail dairy business; the Manufacturing Division produces skimmed milk, cottage cheese, ice cream and powder; the Equipment Division sells farm and dairy equipment to the members.

As the agent of all members in the sale of their milk, it is the Association's purpose to secure the maximum price. The highest price for raw milk is obtained when it is sold for Class I or fluid use, ultimately to be used as table milk or table cream. Sales into Class II or manufacturing use are for the purpose of producing cottage cheese, skim milk powder or other products manufactured from milk. At one time there was a third class, Class III, which was defined as surplus use. Shipping into this category was the least remunerative and least desirable disposition of the members' milk. It was and is the objective of the Association to sell its members' milk into the highest possible class. In actual practice, however, the milk is sold into different classes, for different uses.

At the end of the month each member receives a monthly milk check which represents payment to him for the total number of pounds of milk shipped by him to the Association. The amount each member receives is determined by the percentage of Association milk shipped into each class. For example if 70% of all milk shipped by the Association went into Class I, 20% into Class II, and 10% into Class III, each member would have these same percentages applied to his total monthly shipments. In order to finance the Association's operations a brokerage fee of approximately one cent per gallon is deducted from each member's milk check.

At the end of each year the Association computes the net profits derived from its overall operations and issues a patronage dividend to each member in the form of a Revolving Fund Certificate. This represents each member's pro rata interest—based upon the quantity of milk shipped—in unexpended brokerage, net profits from the sale of equipment, and net profits from the general operation of the Association. These certificates are payable to the membership over a period of time which is within the discretion of the board of directors.

The appellants' bill charges the officers and directors of the Association with a series of acts which they say constitutes "waste, illegality, gross negligence, culpable mismanagement in the affairs of the Association and breach of trust and fiduciary duty." We shall now consider the evidence produced in support of the allegations in the bill.

## THE FINDINGS OF FACT

The chancellor adopted "the proposed findings presented to the court on behalf of the defendant directors to the fullest extent not inconsistent with" any findings in his oral opinion. Those findings, with only minor editing, we shall now set forth.

## THE EMBASSY DAIRY PURCHASE

Early in 1954 James Ward, the owner of Embassy Dairy (Embassy), suggested to Hooper, then assistant-secretary of the Association that the Association should purchase his dairy. Embassy did not purchase milk from Association producers but rather took its fluid milk supply from "Bootleg" and independent producers. As a result available Association milk was being sold for Class III surplus use rather than going into Class I use.

The possibility of purchasing Embassy was an attractive proposal to the management and directors of the Association, since it would eliminate price cutting by Ward and enable the Association to sell its members' milk to Embassy for more than the members would have received if the milk was sold as surplus.

Originally Ward told Hooper that he was asking $7.5 million for the dairy. Hooper said this was an unrealistic figure but nevertheless reported Ward's interest to Mr. Derrick, then general manager and secretary-treasurer of the Association, and the board of directors, who suggested that Hooper should continue to pursue the matter with Ward.

While the negotiations with Ward were continuing, the Association took various steps to determine the most feasible method of financing the contemplated acquisition. The proposal to acquire Embassy was presented to the Baltimore Bank for Cooperatives, a banking institution chartered by the Federal Government for the purpose of making loans to farm cooperative associations. Various officers of the Baltimore Bank for Cooperatives considered the Association's proposal and conducted field visits to the dairy. The Baltimore Bank and the United

States Department of Agriculture were informed of the method in which the Association proposed to finance the acquisition of Embassy, the method of pricing the milk sold to Embassy, and the method whereby the Association proposed to repay the loan to the Baltimore Bank for Cooperatives. The United States Department of Agriculture recommended the Association's proposed acquisition to the Bank, and eventually the Bank agreed to commit to lend up to $2,100,000 toward the purchase price.

On April 12, 1954, Hooper turned to the legal aspects of the acquisition and asked Mr. William E. Leahy and Col. William J. Hughes, Jr., the general counsel of the Association, to look into the question whether the purchase of Embassy would be permissible under the antitrust laws of the United States.

Hughes thereupon undertook to comply with Mr. Hooper's request. During the course of their prior representation for the Association, Leahy and Hughes had both had extensive experience with the provisions of the Capper-Volstead Act, 7 U.S.C. § 291, et seq. The provisions of this Act immunized farm cooperatives from certain strictures of the antitrust laws, and in considering the question both Hughes and Leahy resolved that, because of the Act's special provisions for farm cooperatives, the acquisition was not objectionable from an antitrust standpoint.

On April 14, 1954, Hughes appeared before the board of directors and, after a full discussion of the legal aspects of the acquisition, advised the board that he and Leahy were of the opinion that the purchase of Embassy would not be a violation of the antitrust laws.

On April 14, 1954, the board of directors acting upon the advice of counsel and management, after appraisal of the property and after a thor-

ough discussion on all aspects of the transaction, authorized the Association to purchase Embassy. It was contemplated by them that the purchase would be financed through the $2 million loan from the Baltimore Bank for Cooperatives, a $500,000 loan from some fifteen participating banks and $1,750,000 which would be raised directly by the members of the Association through their subscribing to Association Certificates of Indebtedness. These certificates were in fact loans to the Association by its members and were to be interest-bearing, paying 5 percent from the date of issuance. They were to have a minimum maturity date of five years and a maximum redeemable date of twelve years. The purchase was to be almost 100 percent "financed" and provisions were made to secure a rapid curtailment of the debt.

For the purpose of informing the membership on the purchase of Embassy and for soliciting producer subscriptions to the Certificates of Indebtedness "District Meetings" in all producer districts were called by the Association. All members were informed by notice of these meetings. At these meetings directors and management explained in detail the reasons for the purchase, the benefits expected to be derived from the purchase, the price being paid for Embassy, the method of financing the purchase, the method of retiring the indebtedness and the method of pricing the milk which went into Embassy until the indebtedness was retired. The plan received the enthusiastic endorsement of the membership with over 1,000 producers subscribing to Certificates of Indebtedness.

The proposed plan of operation for Embassy if it were acquired by the Association initially took into account that the milk which would be shipped there would otherwise have gone into

Class III surplus use at a Sealtest milk plant in Frederick, Maryland. In shipping this milk to Sealtest for Class III surplus use, the Association never received the full Class III price since Sealtest extracted certain handling charges and required the Association to build storage tanks for the milk, at its own expense. The Association was at the mercy of Sealtest when it shipped milk to them at Frederick.

The plan as presented to the membership for the pricing of Association milk which would be shipped to Embassy assured that the producers would receive more than they would have received if their milk had been sold for surplus use. The difference between the increased price which the members received and the Class I price would initially be used to retire the bank indebtedness which arose from the acquisition of Embassy.

Although the profits from the operation of Embassy were to be used to retire the indebtedness, the profit figure was also added as a credit to the members' revolving fund for that particular year. Each member's revolving fund certificate would reflect the net profits from the Embassy operation which were based upon the price at which the Association sold the milk to Embassy, until such time as the bank indebtedness was completely discharged. At the time of the acquisition of Embassy the members of the Association were fully informed of the appraisals which the board had had made of Embassy, the approximately $4 million investment the Association proposed to make in Embassy, the method of pricing the milk to be sold to Embassy, and the profits which would be added to the revolving fund as a result of this price adjustment.

On May 26, 1954, the Association entered in-

to an agreement with Ward for the purchase of Embassy. The terms of this agreement provided that the Association would purchase all assets for $2.5 million; assume a mortgage on Embassy's fixed assets of $440,815.21; and pay to the seller the balance due on all accounts and notes receivable to be determined as of the closing date. The agreement provided for an initial payment of $1 million to be made by July 1, 1954, and the remainder as soon thereafter as practicable but in any event no later than July 31, 1954. If the Association voluntarily defaulted on the July 1 payment, it was to pay Ward $200,000 in liquidated damages.

On June 7, 1954, Hughes received a telephone call from Mr. Ambler Moss, the attorney for Ward. Moss stated that he had received a letter of inquiry from the Antitrust Division of the Department of Justice concerning the proposed purchase and that he had made an appointment for himself and Hughes to meet with lawyers of the Antitrust Division. On June 8 Hughes and Moss went to the Department of Justice and were informed by Mr. Joseph Saunders and other attorneys that the Department had not taken any position on the propriety of the acquisition; they merely desired information. Hughes and Moss answered questions propounded by the Department's attorneys. Hughes informed them that the agreement had been signed on May 26 and that it called for the initial payment to be made on July 1 and that if the Association voluntarily defaulted they would subject themselves to liquidated damages.

At the June 8 conference it was agreed that the Antitrust Division would send the Association a questionnaire asking for further information. The questionnaire was sent and the an-

swer was delivered in person to Saunders on June 15 at approximately 4 p.m. Hughes also delivered a copy of the May 26 agreement between the Association and Embassy. Saunders again inquired as to what the time element was, and Hughes set forth the provisions requiring the payment of $1 million on July 1 with the liquidated damage clause of $200,000. At this time Saunders informed Hughes that if the Department of Justice found the transaction "objectionable it would get in touch with the Association between now and July 1 and that if [the Association] were not advised between now and then of any objections [it] could assume that there were none." Saunders suggested that Hughes could call around the 24th or 25th of June if he wanted to ease his mind and Hughes agreed to do this. At no time during the discussion was Hughes (or Moss) advised that the Department considered the acquisition to be a violation of the antitrust laws.

On June 25 Hughes telephoned Saunders to "obtain the Department's decision as to the proposed deal." Saunders responded that certain statements which Ward had made in the newspapers prevented the Department's giving him a decision for two or three weeks. Hughes drew to Saunder's attention the provision of the agreement requiring the $1 million payment on July 1, and Saunders indicated he thought the Association should make an effort to extend the date of payment. Hughes indicated he did not think the owners of Embassy would agree to this.

Immediately after the telephone call to the Department on June 25, Hughes consulted with Herbert Bergson, Esq., and Herbert Borkland, Esq., of the firm of Bergson & Borkland. Berg-

son, the former Assistant Attorney General in charge of the Antitrust Division, told Hughes that he concurred in general counsel's opinion that the transaction was immunized by the provisions of the Capper-Volstead Act and that the Association would not be violating the antitrust laws if it acquired Embassy.

On June 28, 1954, Hooper, on behalf of the Association, wrote to the Honorable Stanley N. Barnes, the Assistant Attorney General in charge of the Antitrust Division, stating that the Association, under its contract, was obligated to make the $1 million payment but that in view of the Department's interest the Association was making the payment in escrow. This letter was delivered in person by Hughes to Mr. Barnes at the Department. The Association never received a response to this communication.

On July 8 Hughes, Moss and Ward again went to the Department of Justice for a conference on the proposed acquisition. The attorneys from the Department asked more questions, but at no time did they suggest to counsel for the parties to the transaction that the Department considered the acquisition to be a violation of the antitrust laws.

On July 13, 1954, Hughes, along with Messrs. Moss and Ward attended another conference at the Department of Justice. No suggestion was made at this conference that the Department considered the acquisition to be a violation of the antitrust laws. Having heard no objection from the Department of Justice, as they were told they would if the Department considered the transaction in violation of the law, the Association consummated the purchase of Embassy on July 26, 1954, by making the

payments provided for in the May 26, 1954 agreement. The Association paid, once accounts receivable were valued, approximately $3,890,-000 for Embassy.

In the afternoon of July 26, 1954, Saunders attempted to call Hughes but was unable to complete the call because Hughes and Leahy were in a conference. Saunders left word. Approximately ½ hour later Saunders's secretary called to say that the call was cancelled. The following day, July 27, Hughes called Saunders who stated that he had cancelled the call when he learned that the transaction had been consummated. Hughes said he would be happy to come down to the Department and fill in the details, and he subsequently received a telephone call that he could do so at 3 p.m. on that day. At this meeting the attorneys for the Department indicated to Hughes that they were "a little surprised" that they had not been advised that the transaction had been consummated. They were reminded by Hughes that the Department was to have advised the Association "if it found anything objectionable and that not having heard from them [he] assumed that nothing was in fact objectionable." Saunders "conceded" that if the Department had found anything wrong, it was to have *advised the Association,* and they proceeded to a further discussion relating to the Ward producers, the Capper-Volstead Act and the operation of retail dairies by cooperatives.

It was not until November 21, 1956, some *two years and four months* after the purchase and on the day suit was filed challenging the propriety of the acquisition, that the Association was first informed that the Department had taken a position on the matter; namely, that the acquisition was a violation of the antitrust laws.

We find in the chancellor's opinion nothing inconsistent with the adopted findings of fact set forth above. Indeed, he further found that the "price paid was a fair and reasonable price"; that counsel relied upon "are most able in the field" of antitrust litigation; that Leahy (now deceased) was "prominent not only locally but nationally [and he had been] dean of a law school in Washington, an outstanding trial lawyer and one of the most able and respected members of the District of Columbia Bar"; that Hughes's credentials are "most impressive"; that Bergson is a former Assistant Attorney General who had been in charge of the Antitrust Division; that Borkland had had a prominent position in the Antitrust Division. He found also that the directors were fully briefed by counsel; that the decision to acquire Embassy was a business decision and that there was "no basis for the contention that the directors' mistake constituted gross or culpable negligence."

## THE ACQUISITION OF RICHFIELD

The second of the "series of acts" arises out of the purchase of the Richfield Dairy Corporation and Simpson Brothers, Inc., trading as Wakefield Model Farms Dairy (Richfield). The findings of fact adopted by the chancellor, with minor editing, follow.

> The Association had for a considerable period of time been supplying fluid milk to Richfield. The Association considered these customers to be of great value to the Association since they were purchasing approximately 12,000 gallons a day of its Class I milk. The Association had, however, experienced difficulty in collecting its milk bills since Richfield had been experiencing difficulty meeting its overall financial commitments. As a result the board of directors watched very closely the financial operations of Richfield insofar as they affected its ability to

pay the Association, and considered the purchase of Richfield.

Because of the concern over the financial condition of Richfield and the necessity for maintaining the continuing market for Class I milk the board of directors asked the then general counsel, Hughes, and special antitrust counsel, Messrs. Bergson and Borkland to consider the legality of the acquisition by the Association of Richfield.

On June 13, 1957, Bergson and Borkland submitted their written opinion to the board of directors that the acquisition of Richfield would be unobjectionable from an antitrust standpoint. Counsel commented that "[t]he act of the Association in taking over Richfield is not part of a program of development or expansion; it is primarily a salvage operation designed to prevent a very substantial loss. The fact that the acquisition will furnish additional volume to Embassy in no way detracts from this basic consideration."

In considering the possible purchase of Richfield the board was advised that it had been recently approached by a number of nationally operated dairies such as Foremost, Beatrice Creamery, National Dairies and also local concerns such as Thompsons, Alexandria Dairy Products, Giant Food Stores who had expressed an interest in possibly purchasing Richfield.

Because of the worsening financial condition of Richfield, the increase in the amount of money owed by it to the Association, the Association's desire to protect this debt, and the Association's desire to protect the 12,000-gallon-a-day Class I sales to Richfield, the board of directors on June 14, 1957, after a full discussion of the legal, financial and other aspects of the problem,

resolved to purchase the capital stock of Richfield.

At the time of the proposed acquisition of Richfield the Association was already in civil litigation with the Department of Justice over the Embassy acquisition. The board of directors, at all times pertinent to discussion of Richfield, sought to obtain from the Department clearance of the Richfield acquisition. Edgar A. Wren, Esq., the attorney for Richfield, had previously secured a clearance for the sale of Richfield. He requested the Department to "revitalize" this clearance on behalf of the Association. Mr. Joseph Saunders of the Department had, however, advised Wren that because of the pending Association litigation the request had not been considered. Mr. Saunders advised Wren, who in turn advised the Association, that the "parties were free to take whatever action they wish."

On December 6, 1957, the Association purchased the entire capital stock of Richfield for $375,000. At the time of the purchase Richfield was indebted to the Association in the amount of $556,681.93. It was recited in the contract that Richfield was unable to meet any payments on this indebtedness and that the only way the debt could ever possibly be paid would be through the integration of the Richfield operations into the existing Embassy operation of the Association.

In the Annual Report for the year 1957, the membership of the Association was advised as follows:

"On December 6, 1957, * * * Richfield * * * [was] acquired and incorporated into the Embassy operations. * * * [It was] acquired by the Association in order to protect its own

financial interest * * * and will be disposed of as real estate."

Subsequent to the acquisition of Richfield its operations were merged into the existing Embassy operation. Approximately $750,000 in fixed assets were acquired in the purchase. The Association sold outright certain land which Richfield had owned for slightly over $50,000 and also sold Richfield's stock in the Washington Bottle Exchange at a gain of $52,000.

Prior to its acquisition Richfield purchased approximately 80 percent of its milk from the Association. When purchased, its volume was 12,000 gallons per day, which represented sales of $379,000 per month and $5,000,000 per year. To develop a similar capacity at a similar plant in Newport News, Virginia (Marva Maid), the Association expended $2,500,000. The cost to the Association of the capital stock of Richfield was $375,000.

It was always the intention of the board to "write-off" the stock of Richfield once the assets of those dairies were transferred to the books of Embassy. When the assets were transferred, the stock became valueless, but the assets which were then on the books of the Association maintained their value thereafter and were reflected in Embassy statements.

The annual financial report of the Fluid Milk Division (Embassy) for the year ended December 31, 1958, shows a book value of $4,090,447.-51. In arriving at this book value, the accountants reflected the "charge-off of accounts and notes receivable of and investment in Richfield $803,544.66." This figure was *deducted* before the accountants arrived at the book value for 1958. The $803,544.66 charge-off was, therefore, reflected in the subsequent computation of

the "net gain" on the sale of Embassy since that computation was based on the December 31, 1960 current book value of the Division. The charge-off would not be again deducted in 1960 since it took place in 1958 and was, therefore, already reflected in the 1960 figure. The 1958 charge-off was reported in the financial reports which were published in the Annual Report for 1958 and distributed to the membership.

On January 9, 1959, the board approved a Finance Committee resolution to reduce the cost of the Richfield stock from $375,000 to zero, which reflected the transfer of the assets to the books of the Fluid Milk Division.

We do not see, in the chancellor's opinion, anything inconsistent with the adopted findings of fact in respect of Richfield. The chancellor observed that it (the Richfield purchase) "has been assailed by the * * * [appellants] as being sheer and gross negligence because at that time antitrust proceedings were already pending." He went on to say:

"We recall, however, an unequivocal communication from Mr. Bergson in the record in this case that in his judgment this acquisition was protected by the Capper-Volstead law. It was on the basis, so far as the legalities are concerned, of his opinion that it went forward, and Judge Holtzoff's decision sustained the purchase.

"As to the business aspects of it, as to the business judgments exercised by the defendant directors, it appears to the court that at the time they made this acquisition, while we may now debate its wisdom, on the basis of the facts as they appeared to them, this cannot be said to be a grossly and culpably negligent decision for them to have made. They made it at a price which was not an unreasonable price. They

made it at a time when the customers of that particular dairy represented a substantial segment of the market. To them undoubtedly it seemed that this was, especially in the light of the fact that the company was in debt substantially to the Association, that this was conceivably a way of protecting themselves in acquiring not only a dairy and its customers but also its physical properties. This was not an indiscreet or unwise decision. We may quarrel with it now many years after the fact, but the court cannot say as a matter of fact or certainly as a matter of law that the acquisition of Richfield-Wakefield was a mistake of negligent or grossly negligent proportions."

### THE EMBASSY SALE

Next in the "series of acts" complained of is the sale of Embassy. The findings of fact adopted by the chancellor are set forth below, virtually without editing.

On November 21, 1956, the United States Department of Justice filed a civil suit against the Association alleging that the acquisition of Embassy violated §§ 2 and 3 of the Sherman Act and § 7 of the Clayton Act. 15 U.S.C. §§ 2, 3, 18. Judge Alexander Holtzoff of the United States District Court for the District of Columbia dismissed the § 2 Sherman Act charge but after a trial held that the acquisition violated § 3 of the Sherman Act and § 7 of the Clayton Act. 167 F. Supp. 45 (1958) ; 167 F. Supp. 799 (1958) ; 168 F. Supp. 880 (1959). The United States filed an appeal in the form of a Jurisdictional Statement in the Supreme Court of the United States, from the District Court's refusal to grant certain requested relief and the dismissal of the § 2 Sherman Act charge. The Associa-

tion filed a cross-appeal, and the Supreme Court noted probable jurisdiction on both appeals and consolidated the cases for argument and consideration. 360 U. S. 927 (1959). On May 2, 1960, the Supreme Court upheld Judge Holtzoff's findings of antitrust violations and also vacated the judgment on the § 2 Sherman Act question and remanded the case to the District Court for a new trial on that issue.

From the time of the filing of the complaint in the District Court, through the pretrial proceedings, the full trial on the merits, the response to the Government's appeal in the Supreme Court, the filing of a cross-appeal in the Supreme Court, the preparation of briefs, the presentation of oral argument, the subsequent compliance with the Court's order and the continuous conferences with the Department of Justice, the Association paid Messrs. Bergson & Borkland, special antitrust counsel, $128,224.40 for legal fees, printing of briefs and disbursements for the six-year period covering 1957 to 1962.

On May 3, 1960 the Association immediately wrote to all members informing them of the Supreme Court's decision. Secretary-Treasurer and General Manager Hooper informed the members that "we respectfully differ with the Court but as good citizens we will obey, with good grace, its decision" and sell Embassy as the court had ordered.

At the May 5, 1960 board of directors meeting Messrs. Hughes, Bergson and Borkland explained the Supreme Court's decision to the board. The board considered "the different possibilities of disposing of the Embassy Dairy property" and the board authorized management to "secure an appraisal of Embassy Dairy

for guidance in its future disposition." On July 8, 1960, the Plant Committee passed a resolution in the form of a policy directive which instructed management, in disposing of the Embassy operation, to steer away from assurances that the Association would stay out of the retail milk business and not to effect a sale of Embassy which would limit the Association's right to sell its members' milk in any way not prohibited by the orders of the United States District Court. On July 15, 1960, Messrs. Hughes, Bergson and Borkland discussed with the board the policy to be followed in disposing of the assets of the dairy and the board approved the Plant Committee's resolution of July 8 with respect to the policy directive that management should follow in conducting negotiations.

On August 9 Hooper sent a memorandum to counsel setting forth certain questions he wanted answered so as to "guide [him] in the necessary actions in connection with the Embassy Dairy decree." On August 24, 1960 Messrs. Hughes and Borkland answered this memorandum, stating in relevant part that in disposing of the dairy the Association could:

(1) refuse to give a non-compete agreement;

(2) could give a partial non-compete agreement;

(3) that the Association was required to sell Embassy as a "going concern" so as to restore competition as it existed prior to their purchase of Embassy; and

(4) that the Association could, if it wished, acquire land and build its own dairy in the metropolitan area.

On October 10, Marshall and Stevens, Incorporated, independent appraisal engineers, hired by Hooper at the board's direction, submitted

to the Association a preliminary report on the fair market value of the fixed assets of Embassy. They advised the Association that the fixed assets carried a value of approximately $3,216,000. This included the Richfield assets which had been put on Embassy's books, but not those the Association had sold and also did not include accounts receivable. On October 24, Marshall and Stevens submitted their final report, and it showed an appraised value of $3,-261,000 for fixed assets.

On July 13 J. Ridgely Parks, the manager of Embassy, on behalf of himself and other management employees had written to Mr. Hooper expressing an interest in purchasing the dairy for $2,500,000. This offer was below the price the board and management expected to be able to secure for the assets of the dairy and no other proposal was ever received from this group.

Commencing in the early summer of 1960, numerous businessmen, attorneys, accountants and other interested parties, many apparently brokers, contacted Hooper and expressed interest in the dairy property. Hooper responded to all inquiries and conducted correspondence and conversations with the interested parties with a view toward further stimulating their interest in the dairy. With the exception of Mr. Park's offer and two other offers, one made in late October and one in early November, none of the other parties who had expressed an interest in the dairy made any offers to purchase it.

In early October of 1960 Hooper became aware of the interest of Irving D. Berger in purchasing Embassy. Berger was personally known to Hooper as a man of very substantial means in his own right and also was the son-in-law of one Garfield Kass, also a very well-to-do and reputable businessman.

On October 24, 1960 Berger and his attorney, Mr. Oliver McGuire, met with Hooper. Berger advised Hooper that they wished to make an offer to purchase the dairy and conveyed to Hooper an offer which Hooper in turn conveyed to the Plant Committee. On October 28, 1960 the Plant Committee passed a resolution stating that the offer of Berger should be rejected. At the October 28 board meeting, however, after a full discussion of Berger's offer and his interest in the dairy, it was resolved by the board that "Mr. Berger's offer to purchase Embassy Dairy should be accepted in principle with the proviso that the president appoint a committee including Mr. Hooper and Mr. Remsberg as members to negotiate further as to more favorable price and terms if possible and that the committee be empowered to close the deal."

Under the orders of the United States District Court the Association was required to dispose of the dairy by June 20, 1961. Hooper, because of the profits being made from operation of the dairy, wanted to hold on to it as long as possible. Berger, however, had indicated that he considered his offer to be bona fide and in light of the District Court's orders was disposed to report to Judge Holtzoff that the Association was not complying with the Court's orders. Accordingly, negotiations for the sale continued.

Once it became obvious that Berger had a bona fide interest in purchasing the dairy, the Association management and board members undertook independent efforts to evaluate his financial condition and standing. Their investigation showed a very substantial net worth and excellent financial rating. On October 24 Hooper noted in a memorandum that after his conference with Berger he checked with the Riggs Na-

tional Bank and was advised that Berger had assets of over $20,000,000 and was half-owner of the Seven Corners Shopping Center in Virginia. On October 27, 1960, Mr. Giles Miller, President of the Culpeper National Bank and a member of the board and Plant Committee, received a reply from Mr. James F. Bridges, a vice president of the Riggs National Bank of Washington, to his inquiry on Berger's financial standing, Miller was informed that Berger was a "gentleman of high character and integrity, and he is possessed of considerable means. We regard him as being entirely responsible for his business commitments. * * * Because of the size of his net worth, his endorsement on a note would add considerable strength. [W]e are pleased to recommend Mr. Berger to you." Berger was also requested to submit a financial statement, and he did so.

On November 2, Berger appeared with his attorney Mr. McGuire before a Special Committee of the board of directors wherein his original offer and an Association counterproposal were discussed. The Special Committee proposed the submission of a new offer to Berger, and on November 3 Berger responded with a counterproposal which accepted the terms as proposed by the Special Committee on November 2, except for the fact that Berger refused to have his wife, because of her own independent wealth, also endorse any notes given by his corporation in the transaction. He also assigned different values to different items, but agreed to pay $3,-250,000, plus accounts receivable. The terms of sale as accepted by Berger were $2,355,000 for the physical assets, cash of the business, $150,-000 for good will, $745,000 for a five-year noncompete agreement, plus accounts and notes receivable would be paid to the Association.

On November 3 a meeting of the Special Committee of the board charged with responsibility for the sale was held via a telephone conference call to consider Berger's amended proposal. During the course of the negotiations Berger had offered as security to the Association either a lien on the assets of the dairy or his personal endorsement on all notes given in the transaction. The Special Committee determined that, in view of Berger's financial statement and reputation, the assurance which had been given by the Riggs National Bank, and the undesirable location of some Embassy property, the transaction could be best secured through Berger's personal endorsement and guarantee of all notes. The Committee discussed Berger's refusal to have his wife endorse the notes and finally determined to accept Berger's offer, with his endorsement as security, provided that Hooper once again received adequate assurances from Berger's bank references. Acting on these instructions, Hooper contacted Mr. Roland Carr, the senior vice president of Riggs National Bank; Mr. Bridges, the vice president of Riggs National Bank; and Mr. Russell Bolton, treasurer of the National Savings and Trust Company, and in each instance he received adequate assurances as to Berger's ability to pay. Accordingly, Hooper set up procedures for the execution of an agreement. On November 4, 1960, an agreement between Metropolitan Food Corporation, Inc. (Metropolitan) and the Association was signed wherein, subject to the approval of Judge Holtzoff, the dairy was purchased for a price of (once accounts receivable were valued) $4,261,870.70. This price was in excess of the appraised value of the dairy.

The sale to Metropolitan, a corporation headed by Berger, was made on the following terms:

(1) at the time of settlement a cash payment to the Association in an amount equal to the cash in banks and on hand of the dairy;

(2) a single $250,000 non-interest bearing note due six months from date of settlement;

(3) a single non-interest bearing note in an amount equal to the notes and accounts receivable to the dairy due twelve months from the date of settlement (determined to be $773,455.-53) ; and

(4) a single note for $3,000,000 bearing interest at the rate of 5 percent per annum due fifteen years from the date of settlement; interest to be paid semi-annually, principal to be paid semi-annually in twenty-five successive installments of $100,000 each and a final balloon payment of $500,000; the first installment was to become due two years after the date of settlement.

All notes were to be unconditionally endorsed by Irving D. Berger, and the effective date of settlement was to be January 1, 1961.

On October 27 Hooper had received a letter from Mr. Bruce Philipson wherein he expressed interest, on behalf of an unnamed client, in the acquisition of Embassy. On November 2, 1960, Philipson tendered an offer on behalf of his unnamed client in the amount of $4,000,000. It is not known on what date this offer was received by Hooper. At no time during Hooper's contacts with Philipson did Philipson indicate who his client was. Hooper and the entire board considered this a very critical part of the negotiations since the Association was most concerned with insuring that once it sold Embassy it would continue to be able to sell its producers' milk to the purchaser of the dairy. Not knowing who Philipson represented Hooper was not in a position

to determine if he could insure that Embassy would continue to purchase its milk from the Association. In reporting to Judge Holtzoff on its efforts at sale the Association had stated that it "refused to negotiate with any broker or agent * * * unless such broker or agent would reveal the identity of his principal * * *." Berger, on the other hand, had given assurances that if he bought Embassy he would continue to buy from the Association. These assurances were in fact honored and to this day the Association continues to retain this customer.

The agreement between Metropolitan and the Association for the sale of Embassy was approved by Judge Holtzoff. The parties thereafter proceeded to final settlement with an official settlement date of January 1, 1961.

In the January edition of the *Maryland and Virginia Milk Producers News,* a monthly house organ sent to every member of the Association, a report on the "Sale of Embassy Dairy" was made to each member. The first sentence of said report reads as follows: "The sale of Embassy Dairy to the Metropolitan Food Corporation, headed by Mr. Irving D. Berger, a substantial and influential Washington businessman * * *." The article continued, "[i]n summary, however, the sale figure for Embassy Dairy would be $3,-250,000 plus the exact net amount of accounts receivable, and cash in banks * * *."

In the 41st annual report of the Association for the year ended December 31, 1960, the secretary-manager reported to the membership that "[a]s you have read in previous issues of The NEWS Embassy was sold to a local business man on January 1, 1961 for the sum of $3,250,-000 plus the amount of cash on hand and the value of accounts receivable. This resulted in a

gain of approximately $450,000 which becomes a part of the Members' Revolving Reserve Fund." He also reported in a separate section dealing with the "Antitrust Case" "that [i]n compliance with the court's order, Embassy Dairy was sold effective January 1, 1961, to Mr. Irving D. Berger, a Washington businessman. Further information on the sale of Embassy has been included in other parts of your Annual Report."

During the period of Association ownership of Embassy $5,173,892.12 in profits was realized from the Embassy operation. As a result of the sale to Berger $465,794.41 in net gains was also realized by the Association.

The chancellor's opinion contains nothing inconsistent with the findings of fact set forth above. The following excerpts from his opinion indicate that he made additional findings:

"Parenthetically, we do not agree that this was a fruitless appeal. Monies had to be expended, of course, in counsel fees, but these eminent counsel recommended to the Association's directors that this Association had more than a 50-50 chance. As a matter of fact, we recall in the communications of the manager that they had a better than 90 percent chance of reversing Judge Holtzoff.

"This is not a situation where inexperienced counsel are making irresponsible recommendations to a client, but eminent counsel are making it on the basis of the record then made. It seems to the court that the appeal was properly pursued."

\* \* \*

"When we read the bill of complaint and the Court of Appeals opinion in this case, [we] had no idea who Mr. Berger was. In the trial in this action we have heard and have had him identi-

fied as a man of very substantial means living and doing business in the District of Columbia, receiving the highest recommendation of the Riggs National Bank of Washington, D. C., one of the most responsible financial institutions in the area, if not the country, a recommendation made to Mr. Hooper, made to Mr. Miller, who himself was a banker and who is a correspondent of the Riggs National Bank. We have information here with respect to this man's assets aggregating $20 million, and we know from the testimony in this case that he is related to a family of wealth, the son-in-law of Mr. Garfield Kass, and together with Mr. Kass having developed the Seven Corners Shopping Center, a very substantial commercial enterprise in nearby Virginia.

"So it must be said that, with respect to this man, his signature was indeed better than a lien on the property, and we so find in this case.

"It may well have been that the directors should have obtained not only his signature as an endorser, but, also, a lien on the property. That was not the option available by the purchaser. It wasn't made available to the directors. They had their option and they chose to get his signature and, as the record shows, they protected themselves with respect to a waiver of the wife's dower interest." [4]

## THE $500,000 DISCOUNT ALLOWED ON THE NOTES ENDORSED BY BERGER

The fourth in the "series of acts" claimed to be "culpable mismanagement in the affairs of the Association"

---

4. Evelyn K. Berger, wife of Irving D. Berger, "waive[d], release[d] and relinquish[ed] all right, title and interest * * * [acquired or to be acquired] by statute or otherwise * * * solely by reason * * * [of her marriage to Berger] as may be necessary to meet [Berger's] obligations on the" notes given by Metropolitan Food Corporation to the Association.

is the discount allowed to Eastern Food Products, Inc. (Eastern), the successor to Metropolitan, in consideration of the prepayment in full of the notes endorsed by Berger. The findings of fact adopted by the chancellor are set forth below.

Shortly prior to August 12, 1963, Hooper learned through newspaper articles in the Washington papers that Berger had made provisions for the sale of the assets of Embassy to the Southland Corporation of Dallas, Texas.

On August 12, 1963, Hooper wrote to Berger stating that the Association was concerned and interested in knowing how this transaction was going to affect the $2.8 million note which was still due the Association from the sale of Embassy to his interests. Hooper received a prompt reply from Mr. Oliver McGuire, Berger's attorney, stating that the interests of the Association "have not been jeopardized," and that "Mr. Berger and Eastern Food Products, Inc. are able to and, in my opinion, will meet their respective obligations to the Association when due."

Hooper brought this matter to the immediate attention of Mr. J. Homer Remsberg, the Association president, who told him he too was concerned.

On August 15, 1963, a conference took place between Hooper, Berger and McGuire. The parties concerned themselves with the sale of the Embassy assets to the Southland Corporation and the Association's rights under the note it held. Berger advised Hooper that Eastern had never defaulted on any payments to the Association and that the Association could continue to expect all payments to be made in full when they became due. Berger further stated that he was under no legal obligation to anticipate pay-

ments and intended to meet them in accordance with the terms of the note.

At this conference, or at another earlier conference between the parties, Berger suggested to Hooper that had he been willing to consider an early payment of the note he would require a $1,000,000 discount for so doing. Hooper flatly rejected such a proposal. On August 19, Edward L. Merrigan, the then general counsel of the Association, wrote to McGuire requesting full details of the transaction and further information as to how the Association's interests had been protected. On the same date McGuire responded to Merrigan's letter setting forth the details of the transaction, which required the final payment of monies to Eastern by October 1, 1963. He further stated that the Association could expect to retain Embassy as a Class I fluid milk customer and that Eastern could now either discharge the note to the Association or make the payments when they-became due. McGuire pointed out to Merrigan that the Association still possessed Berger's guarantee of the note and that when the Association took this note its "only real security was the integrity, responsibility and ability of Mr. Berger, and the situation remains unchanged."

On September 3 Merrigan again wrote to McGuire asking that arrangements be made at the earliest date to discharge the $2.8 million note "in whole or substantial part, out of the cash proceeds of sale of the assets which your client acquired from the Association." McGuire responded on September 5 that his clients had no legal obligation to discharge the note until payments became due, but that they would be willing to consider any proposal along the lines of anticipating the note which the Association

would care to make. McGuire also pointed out that a very "substantial discount would be required to induce his clients to discharge the note" because "cash in hand is worth substantially more than cash deferred over a period of twelve years, considering comparative interest rates and the inflationary processes at work." On September 6 Berger himself wrote Remsberg, concerning the fact that he would be willing to anticipate the note for a substantial discount but also warning the Association that he was under no legal obligation to prepay a note which was not in default and that if the Association attempted to bring pressure to bear on him through institution of legal proceedings that such a suit would be unsuccessful and he would take appropriate counteraction if any damage were done to his credit or standing in the community.

General counsel Merrigan gave full consideration to the Association's legal position on this matter. He was of the opinion, and so advised the board, that the maintenance of a suit against Eastern as the maker and/or Berger as the guarantor, would have little chance of success. In arriving at this determination, he considered the fact that:

(1) all payments under the existing note (and prior existing notes) had been met when due and owing;

(2) at the time of the sale of the assets to Southland, the note was not in default and the next payment was not due until January 1, 1964;

(3) there was no evidence to indicate that either Eastern or Berger personally were not in sound financial positions so as to enable them to continue to meet their obligations, indeed the evidence was to the contrary;

(4) the Bulk Sales Act afforded the Association no remedy against Eastern or Berger which would in any way enable the Association to secure prepayment of the note.

With respect to the Bulk Sales Act, the Association had received notice of the sale prior to August 12, when Hooper wrote to Berger's attorneys. McGuire had also informed Merrigan that final payment would not be made until October 1, 1963, at which time the transaction would be closed.

The Bulk Sales Act then in effect, 28 D.C. Code § 1701 et seq. (1961 ed.), did not give the Association a remedy against Eastern or Berger on the note. This act only allowed a transaction to be set aside for failure to notify third party creditors of the sale. It did not give to creditors a right of prepayment of existing debt and the Association had in fact received notice of the proposed sale. More importantly, Embassy was currently purchasing 7 million dollars worth of milk per year from the Association and this volume could be lost through the filing of a specious claim.

On September 13, Merrigan appeared before the Finance Committee of the board and discussed all problems raised by Eastern's sale of Embassy to Southland. After discussion of the matter the Finance Committee passed a resolution authorizing Merrigan to enter into negotiations for the purpose of attempting to prevent any dissipation of the funds which were now available to Eastern and to take such legal action, with the prior approval of the president, which he thought might be proper or necessary to prevent the dissipation of these funds. Merrigan also appeared before the full board of directors on this same day and discussed with the

board the problems arising from the sale by Eastern. The resolution passed by the Finance Committee was approved by the board of directors.

Thereafter, a series of meetings and correspondence transpired among Berger, McGuire, Merrigan and Remsberg wherein the parties exchanged various proposals and counterproposals respecting the parties' legal rights and the amount of discount which would be given if Berger agreed to cause Eastern to prepay the existing $2.8 million note. At this time all payments on the note had been met and it had been reduced from $3,000,000 to $2,800,000. Berger's final offer to the Association was a discount of $500,000 for immediate payment of the note.

Merrigan advised the Board that a suit against Berger could have disastrous consequences since at the time the Association was selling Embassy approximately $7 million worth of milk per year. To have risked the loss of this customer by filing a tenuous suit without the possibility of securing the payment of the note was, in the opinion of general counsel, and he so advised the board of directors, an unwise step to take. He also advised the board that any action against the financial standing or credit of Berger, a man of the highest financial respect in the Washington community, could expose the Association to a very serious countersuit unless the action was successful. In his opinion, the Association had no legal rights to secure prepayment of the note and he so advised the board.

At a Finance Committee meeting and the subsequent board of directors meeting on October 10, 1963, the directors considered the matter of Berger's final offer of $500,000. Merrigan advised them that this was Berger's last offer and

would involve the immediate payment of $2.3 million plus interest instead of the eventual payment over a 12-year period of $2.8 million plus interest. Merrigan noted that the note was not in default and informed the board that in his opinion as general counsel Mr. Berger was under no legal obligation to prepay the note. He also informed the board that he had discussed the matter with his brother, a bank president in New Orleans. After full consideration he advised the board that in his opinion the immediate payment of $2.3 million would be of substantial benefit to the Association.

Giles Miller, Upton Gladhill, Edward Norman and J. Homer Remsberg testified that they computed, arithmetically, the value of $2.3 million immediately as compared to $2.8 million paid over twelve years. They also testified that the board considered the fact that the Association was preparing to borrow money for construction of a new plant in Newport News, Virginia, and also in connection with payments on the 1957 Revolving Fund Certificates. They testified immediate cash payment by Berger would obviate the necessity of borrowing this money and the directors took this into consideration during their discussion.

After a full discussion of the entire transaction and taking into consideration the opinion of general counsel and those members of the board who had particular banking expertise, namely Messrs. Miller, Gladhill and Norman who were all bank officers or directors, the board voted to accept $2.3 million in full settlement of the outstanding debt of Eastern of $2.8 million to the Association.

On October 14, 1963, the Association accepted the payment of $2.3 million, plus interest, in

full discharge of the outstanding indebtedness of Eastern to the Association.

The payment and discount was reflected on the Association's books and was reported by the auditors, Wayne Kendrick & Co., in the Association's financial statement for the year ended December 31, 1963 as "discount allowed on prepayment of Eastern Food Products, Inc. note — $500,000," which financial statement was published in the 44th Annual Report for the year ended December 31st, 1963.

For the purpose of informing the membership Merrigan prepared an 18-page statement dealing not only with the discount but the entire Embassy matter from the Association's purchase of it in 1954 through the discount on the note. This statement was presented to the membership, along with the Dugan Investigation Report, at district meetings in the spring of 1964.

The chancellor, in his opinion, took notice of the fact that Berger, at the time, had in his possession "millions of dollars in cash as a result of the sale" of Embassy to Southland. He said "the situation was disturbing [to the directors of the Association] even though Berger was a man of great wealth and reputation" but, he added, "Berger was plainly anxious to avoid the possibility of a suit clearly suggested by Merrigan." As he expressed it "should they wait out the period of time for the payment of the notes [absent a lien on Embassy's assets] * * * or press for some other solution?" He went on to say:

"Among the circumstances they considered were the facts that they were faced with the necessity for substantial borrowings that year and the next year in connection with the revolving fund certificates, and something in the area of $1 million that year in connection with Mar-

va-Maid and other operations; and on the basis
of their best business judgment they considered
that getting substantially paid then was much
better than waiting for the period of time to
which we have referred."

### THE HARRISON DAIRY PRODUCTS ACQUISITION, THE DUGAN INVESTIGATION, THE HOOPER AND ROBINSON SETTLEMENTS, AND DISCLOSURE TO THE MEMBERSHIP

The final items in the "series of acts" said by the appellants to constitute fraud and culpable mismanagement will be treated under this heading since there is something of an overlap in this regard. The findings of fact adopted by the chancellor, with some editing, are set forth below.

In the spring of 1961 Hooper discussed with
several members of the board the possibility of
the Association selling its milk products on the
Florida market. One of the Association's larg-
est customers in the Florida market, Galloway
West, had recently entered into an arrangement
to purchase its supply from the Borden Com-
pany, and Hooper was anxious to continue to
sell Association products in Florida. Hooper
learned that the Florida Milk Commission
would not, however, issue a permanent permit
to an out-of-state cooperative. They would only
issue individual shipment permits.

J. Homer Remsberg, the then president of the
Association, had a conversation with Hughes,
the Association's general counsel, in the spring
of 1961 "regarding * * * selling products in
Florida." This conversation was "not on the
subject" of Hooper and Robinson setting up a
private corporation but rather dealt with the in-
ability of the Association to get a permit for

the Florida market. Hughes was told by Remsberg to look after the Association's interests.

In late July of 1961 Remsberg found an undated letter on his desk from Hooper in which Hooper sought to review with him "the organization of the distributing corporation * * * Robinson and I have set up to handle Association products as well as some local products in Jacksonville, Florida." The statements and representations in the letter were subsequently joined in by Arthur V. Robinson, who also signed the letter.

The letter stated that Robinson, Hooper and members of their families were the beneficial owners of the capital stock of this distributing corporation. Hooper stated in the letter that it was his intention to be on record so that if the Association felt the maintenance by them of the corporation was not in the best interests of the Association they would sell their stock to the Association at whatever the fair market value might be. Robinson agreed with these representations.

Although Remsberg recalled discussion of the Florida market prior to receipt of the undated letter, he never had a discussion with Hooper or Robinson, wherein he was advised by either that they were setting up a personal corporation in Florida. Remsberg had never approved of such a corporation, and the board had never authorized one.

After receiving the undated letter, Remsberg called Hooper into his office for a conference. He informed him that his and Robinson's ownership of Harrison Dairy Products (Harrison) was, in his opinion, a "pure conflict of interest" and that as president of the Association he would have to "take it [the ownership matter]

to the board" and that in his opinion it "cannot be."

On August 7, 1961, Remsberg received an eight-page letter from Hooper, which also dealt with Hooper's and Robinson's ownership of Harrison in Jacksonville, the distributing corporation he had referred to in the prior letter.

The first member of the board of directors with whom Remsberg discussed Hooper's revelations on Harrison was F. Upton Gladhill. The discussion took place sometime in late July along the side of the road near Gladhill's pea field. Remsberg explained to Gladhill what he had come to learn about the ownership of Harrison, and Gladhill informed Remsberg that he too thought the matter should be brought to the attention of the members of the board at the next meeting.

At the Plant Committee meeting on August 10, 1961, an executive session was held wherein Remsberg brought the members of the Plant Committee up to date on what he had learned about Hooper's and Robinson's ownership of Harrison. The matter was further discussed at subsequent board meetings and a decision was made by the directors that the situation could not continue as it was and that the possible purchase of Harrison should be explored.

Subsequent to the disclosure of Hooper's and Robinson's interests in Harrison, Hooper advised Remsberg that he was scheduled to appear before the Florida Milk Commission. The appearance, he suggested, could only be made in his capacity as an officer of a Florida corporation, and he also deemed it in the Association's interest for him to do so. Conversations with Robinson on the possible purchase also took place.

At the board of directors meeting of January 12, 1962, the board passed a resolution authorizing the Executive Committee to go to Jacksonville, Florida, to make a first-hand inspection of the Harrison operation. On February 1, 1962, the Executive Committee met at the Harrison plant in Florida for the purpose of inspecting the facilities. What they saw was a "going dairy concern." It was a small plant, well kept, with an inventory of powdered and sterile milk, and several employees were present and working. The overall impression was one of substantial activity at the facility.

On February 9, 1962, the Executive Committee recommended to the board that the Association purchase Harrison. On the same day the board approved the Executive Committee resolution. In approving the purchase of Harrison, on terms to subsequently be determined, the board of directors took into account the personal inspection trip by members of the Executive Committee and their report that the operation was a "going concern." They also considered the elimination of the conflict-of-interest situation, which they believed the operation of Harrison presented. The board was also aware of the potential Florida market for Association products which Harrison was apparently serving.

Remsberg requested Edward L. Merrigan, an attorney who had been doing work for the Association, to represent the Association in drawing up the final papers for the sale of Harrison. Remsberg took this step to insure protection of the Association's interest since Hughes, the then general counsel, had been involved in the initial chartering of Harrison.

Remsberg gave Merrigan a copy of a pro-

posed agreement between the parties, which set forth the terms at which the Association would purchase Harrison and also a document entitled, "Basis for Sale of Harrison Dairy Products," which indicated that the figure would be approximately $89,000.

In order to compute the exact purchase price, Merrigan sent to Ernest Clifford of Wayne Kendrick & Co. on March 27, 1962 a copy of the agreement between the parties along with the "Basis for Sale" document which he had been given by Remsberg. Clifford was requested to compute the actual purchase price per the agreement and to prepare a statement showing his computations.

On April 9, 1962, Wayne Kendrick & Co. submitted a report to Merrigan computing the value of the Harrison stock as per the proposed agreement of purchase. This figure was $81,-341.27 as shown by the computation in Exhibit A of Kendrick's report.

Remsberg and Merrigan discussed the Wayne Kendrick statement prior to the actual consummation of the purchase on April 12, 1962. Remsberg was aware of the fact that the business of Harrison was "primarily the sale of merchandise purchased from [the] Association," and also that the book value of Harrison stock, one of the factors to be considered, was $33,641.72. Book value, however, was not determinative in Remsberg's mind of "actual value" and the board was interested in buying a "going concern" which had a license to operate in Florida. Remsberg was aware of the fact that the actual figure at which Harrison was purchased was approximately $8,000 less than the proposed figure which had been submitted to Kendrick.

In deciding to purchase Harrison, the board

of directors relied upon: (a) the recommendation of their Executive Committee, which had inspected the property; (b) they considered the computation of the approximate purchase price as computed at $89,000; (c) their opinion that the price represented fair market value; (d) their belief that they were purchasing a going concern which was profitable and active in the Florida market; and (e) their desire to eliminate what they considered to be a conflict of interest.

At the time of the Association purchase of Harrison on April 12, 1962, no director of the Association was aware of the fact that large portions of Harrison's sales were to previous customers of the Association or that actual delivery of products, the sales of which were credited to the books of Harrison, were being made directly from the Laurel, Maryland, plant. Furthermore, there were no documents in the Association's files which reflected the above.

Subsequent to the acquisition of Harrison, the Association's records reflected substantial sales and profits from the plant's operation for the last nine months of 1962.

Sometime during the latter part of 1961 Remsberg, and other members of the board, became aware that Robinson and his partner, Berman, through a corporation known as Mutual Milk Sales, Inc., were involved in constructing a milk processing plant in Oneida, New York, for a federation of New York cooperatives. The fact of Robinson's participation in the construction of the plant was reported in several trade journals, and Hooper was aware of Robinson's making weekend trips to Oneida. The members of the board were, however, unaware of the fact that Robinson was involved in the actual man-

agement of this plant when it became operative in the spring of 1962.

*Mr.* Hooper and members of the Plant Committee were aware of the fact that sales of powder manufactured at Laurel were often made at prices less than the government support price. This matter had been discussed among Hooper, Robinson, Click (identified *infra*) and members of the Plant Committee; and while the parties differed on the actual amount, they were in agreement that sales to the government could actually result in the Association's receiving between 2 and 3 cents less per pound than the actual price paid by the government. This resulted from several factors:

(a) within a period of one year from the time of sale, the government could reject for impurity any of the powder which it had purchased;

(b) if powder was rejected, the cost of removing it from the warehouse was borne by the seller;

(c) sales to the government required multiple inspections and resulted in delay in removing the powder from the Association's limited storage facilities at Laurel;

(d) it took the government between ninety and one hundred and twenty days to make payment to the Association;

(e) special bags were required for packing the government powder;

(f) the Association had to pay the government's inspection costs; and

(g) if one bug was found in a shipment, the government prohibited resale for human consumption, and the powder could then only be sold far below the government price for use as animal feed.

During the course of 1962, sales from Laurel

below the government support price were made to Mutual Milk Sales Packaging Division, Inc. It was not until February of 1964, however, when Dean Dugan rendered his report to the Association that any member of the board of directors became aware that Arthur Robinson was a co-owner of Mutual Milk Sales Packaging Division, Inc.

The operation of the Laurel plant was profitable to the Association. While labor costs and market conditions affected profit margins, the plant was exceptionally successful and earned over $4,000,000 between 1958 and 1963. The plant at Oneida was not in direct competition with Laurel as it could not produce the same high grade powder, "Grade A," which Laurel did and it served a different milk shed area. In some instances, Laurel and Oneida even cooperated to the benefit of Laurel in handling shipments of "Extra Grade," a lower grade powder which Laurel also produced, which Laurel alone could not fill.

On November 8, 1963, James E. Click, the assistant general manager and assistant treasurer of the Association, submitted his resignation to the board of directors. At this same meeting, Click leveled a series of charges against Hooper and Robinson which alleged impropriety and conflict of interest in the performance of their official duties for the Association. Click had, in July of 1962, previously submitted a memorandum to Hooper which set forth certain rumors which had come to his attention. At the time of his resignation in November of 1963, Click attempted to substantiate some of the earlier charges and included in his charges every rumor which had come to his attention in the interim.

The ˉboard of directors refused to accept Click's resignation on November 8, 1963 but instead voted to authorize a full investigation of the Association's affairs, past and present.

The Plant Committee was given the responsibility for seeing that an independent, thorough and full investigation was made. Merrigan, the then general counsel, submitted the names of three individuals to the Plant Committee, all, in his opinion, qualified to conduct the investigation. The Plant Committee chose Dean Frank Dugan of the Georgetown University Law Center, a nationally renowned fact-finder, to conduct the fact-finding mission. It also hired Wayne Kendrick, the Association's auditor, to personally assist Dean Dugan in his investigation.

Dean Dugan as a condition of accepting the responsibility for the investigation insisted that his report be covered by the attorney-client privilege and be confidential because of the unique nature of the investigation.

Using as a basis for his investigating the charges leveled by Click, Dean Dugan called nineteen witnesses before him, all of whom appeared freely, voluntarily and without counsel.

On January 30, 1964, Messrs. Merrigan, Dugan and Remsberg were advised by Robert M. Goldman, Esq., that he represented Robinson. On January 29, 1964, Hooper advised Dean Dugan that he had retained James T. Reilly, Esq., as his attorney.

At a Plant Committee meeting on February 12, 1964, Dean Dugan read and explained his report. On the same day Dean Dugan again read and explained his report to the entire board of directors. At this same meeting, Wayne Kendrick discussed two confidential reports which

he had prepared in the course of Dean Dugan's investigation. One of these reports showed that Harrison, during the period of its ownership by Hooper and Robinson, had made a gross profit of $135,529.67 from sales to former customers of the Association or new customers whose purchases had been shipped directly from the Association's Laurel plant. The other report showed that Mutual Milk Sales Packaging Division, Inc., had made gross profits of $100,256.23 from the resale to Weldon Farms Products, Inc., of milk powder which it had purchased from Laurel, but which had been shipped directly to Weldon from the Laurel plant.

In the course of his investigation for Dean Dugan, Kendrick was able to conduct a complete study of the Harrison books and records. With respect to Mutual Milk Sales Packaging Division, Inc., Kendrick examined each sale on the Association's books and also Mutual Milk Sales Packaging Division, Inc.'s sales records which showed the other side of each transaction. The latter documents were made available to Kendrick by Robinson at Merrigan's request. Kendrick was also able to determine the gross profits which Mutual Packaging made on these sales by virtue of a certificate from Robinson's accountants. No other sales of dairy products were made by the Association to any corporation with which Robinson had any connection.

On February 12, 1964, as a result of the revelations in the Dugan Report, the board of directors requested Hooper to resign. Hooper refused to do so, and he was immediately terminated by the Association. Robinson's contract had not been renewed, and it expired on December 31, 1963.

In his report to the board, Dean Dugan sug-

gested that certain matters which he had not had time to follow up should be considered by the Association. One document in his possession indicated Hooper had a connection to Marshall Properties, Inc. Click had also questioned the relationship, if any, of Red-73 to the Laurel plant. Dugan recommended that an investigation of the latter be made. Subsequently Merrigan wrote Click, who had been made acting secretary-treasurer and general manager, and as a result, Click requested Messrs. Snyder, Marshall and others on the Association's staff to continue to investigate the above matters and also any matters which might involve claims against Hooper and Robinson. Among the latter were an allegation of improper use of an airplane which had been rented by the Association from Hinson Aviation Company, an entity in which Robinson had an interest, and the alleged purchase of certain assets from Mutual Milk Sales. Merrigan was advised by Click that he was satisfied that there was no additional information which substantiated any charges of impropriety in connection with these allegations.

The board of directors, after receipt of the Dugan Report, had authorized Merrigan and Dean Dugan to take steps to recover for the Association monies due from Hooper and Robinson. On or about February 25, 1964, Merrigan, at a conference in his office, presented the Association's demands. Mr. Reilly asserted claims against the Association on behalf of Hooper in the amount of $112,000 plus unliquidated claims and punitive damages. Merrigan threatened to bring action under the Association's crime bond and counsel for the other side responded by asserting their own claims against the Association.

Merrigan and Dean Dugan examined the prospects of litigating the claims against Hooper and Robinson. They came to the conclusion that it would most probably be necessary to institute numerous and separate proceedings in different jurisdictions if litigation were resorted to. They also considered the fact that the claims of Hooper were not without merit. They also considered the litigation expense which would be involved and the uncertainty of the eventual result.

After a thorough study of the posture of all parties to these negotiations and the merits of the respective claims, Dean Dugan and Merrigan recommended in a detailed written report to the board of directors that they authorize a settlement with Hooper and Robinson.

At a board of directors meeting on March 13, 1964, the reasons for and the details of the settlement recommended by Dugan and Merrigan were presented. A copy of Dugan and Merrigan's letter was given to each director, and the recommendations contained therein were explained and discussed among the board and counsel. Counsel were informed that the board wished to extract the maximum amount of money from Hooper and Robinson and to pay as little as possible to satisfy Hooper's demands. Dugan and Merrigan explained to the board their opinion that it would be necessary to institute multiple legal proceedings in different jurisdictions if the Association decided to litigate the matter. They also said that they could not guarantee success in these proceedings and pointed out the cost to the Association of maintaining several lawsuits. It was their recommendation to the board of directors that the settlement as outlined in their letter be entered into since, in

their opinion, it insured the Association a substantial recovery, avoided the costs of litigation and would allow the Association to put its own house in order and proceed with the business of selling the members' milk. It was the opinion of counsel that the settlement as outlined in their letter of March 10, 1964, was in the best interests of the Association.

After a thorough discussion of all aspects of the release transaction and in reliance upon the recommendation of Dugan and Merrigan, the board of directors authorized counsel to enter into mutual releases between the parties.

During the period of time after the board had authorized counsel to consummate releases with Hooper and Robinson, Merrigan sought assurances from Click and other members of the board that all pending matters between parties had been fully explored to the satisfaction of the Association. Merrigan received assurances from Click that the matters which Dean Dugan had requested be given further attention had, in fact, been looked into by the Association and found to not involve a possible cause of action in favor of the Association against Hooper or Robinson. This investigation was conducted prior to the time the releases were entered into.

Merrigan continued to keep members of the board informed of his investigations and negotiations up until the actual consummation of the releases.

On April 1, 1964, the Association executed mutual general releases with Hooper and Robinson. As consideration, the Association received:

(a) a check from Robinson for $95,686.65;

(b) a credit on salary due Robinson under his 1963 contract in the amount of $38,527.28;

(c) a credit on the unpaid balance due for the stock of Harrison in the amount of $19,-700.07;

(d) checks from Hooper in the amounts of $818.69 and $254.51 for miscellaneous accounts;

(e) release by Hooper of approximately $46,-000 in liquidated and other unliquidated claims against the Association;

(f) the release of the Association from claims of Robinson, his family, Mutual Milk Sales, Inc., Mutual Sales Packaging Division, Inc., and Olney Acres Dairy Products; and

(g) indemnity of the Association for possible claims against it by the minor children of Hooper and Robinson.

The releases by the Association of April 1, 1964 were the result of substantial research and consideration on the part of Merrigan, Dugan, Association employees and the board of directors; the setting forth of all claims by the respective parties; continuing investigation by the Association; arms-length negotiations among the attorneys for the parties; the opinion of general and special counsel that the releases were in the best interest of the Association; and the decision of the board, in reliance on counsel's opinion, that the Association's interests could best be protected through execution of general releases.

Subsequent to the execution of the releases with Hooper and Robinson, Dean Dugan continued his investigation, focusing on charges which had been made against Click by Hooper and M. Belmont Ver Standig, the Association's public relations advisor. The board determined that the entire matter could only be fully brought to rest after these charges had been explored.

Merrigan attempted to arrange for Hooper to testify but was informed by Hooper's attorney, Mr. Reilly, that Hooper would only testify if the Association would grant him the right of indemnification for any damages he might experience as a result of his testimony. Merrigan refused to do this. Dean Dugan attempted on several occasions to arrange for Belmont Ver Standig to testify but Ver Standig was ill. Ver Standig was contacted at his place of recuperation and finally stated he would not appear to testify.

Dean Dugan drew to the attention of the board the efforts which had been made to secure testimony from Hooper and Ver Standig. On May 8, 1964, the board voted to conclude the investigation into the affairs of the Association since it was obvious that the testimony of neither of these individuals could be secured. It was stipulated by all parties that there was no merit to the allegations made against Click.

During the course of Dean Dugan's report to the board, he had mentioned the entity, Marshall Properties, Inc. Marshall Properties, Inc. was a corporation used by Robinson and his partner, Berman, to acquire land in Laurel, Maryland. They did not wish it known that they were acquiring the property and, as a result, asked Hooper if they might use his name as president. Hooper allowed them to do so. Hooper performed no services for the corporation, received no money from the corporation, and the corporation had no business whatsoever with the Association.

During the course of his report to the board Dean Dugan mentioned the entity, Red-73, and suggested that its relationship, if any, to the Association be looked into. Red-73 was a manufacturing plant somewhere in Indiana or Ohio,

which was owned by C. Y. Stephens, the owner of High's Dairy. Robinson purchased the stock of Red-73 for the purpose of liquidating the corporation. Robinson did not operate it as a dairy or manufacturing plant but rather sold off its assets. There was no connection between the Association and Red-73. Click mentioned Red-73 to Dean Dugan as an unsubstantiated rumor and without knowledge of the true nature of its operation or Robinson's relationship to it.

As a result of sales made by the Association to High's Dairies, the estate of C. Y. Stephens and corporations owned by him owed the Association approximately $275,000. All of these funds were fully paid with interest.

Subsequent to the settlement of April 1, 1964, with Hooper and Robinson, the Association filed a claim for federal income taxes which had been paid during the period of time that Hooper and Robinson owned Harrison. This claim was subsequently settled when the Association recovered $25,000 of the approximately $50,000 which Harrison had paid in taxes. A similar claim was filed with respect to the sales to Mutual Milk Sales Packaging Division, Inc., which is still pending. [Its present status is unknown to this Court.]

At the board of directors meeting of February 14, 1964, Wayne Kendrick presented his Annual Report on the operations of the Association. At this time the investigation into the affairs at the Laurel manufacturing plant was still continuing, and a determination had not been made as to whether there were any additional claims against Hooper and Robinson arising out of the Laurel operation. In order to adequately reflect that the investigation was still continuing and to indicate that a resolution of

the matter had not yet taken place, the board authorized Merrigan and Kendrick to draw up an appropriate comment, which would indicate that the Laurel operation was still under investigation.

To reflect the above Merrigan and Wayne Kendrick agreed to include the following comment in the financial report for 1963, which would be published in the annual report for that year:

A review of sales, prices and procedures at the Manufacturing Division has been initiated but determinations and adjustments, if any, were not completed at the date of this report.

At the annual meeting on February 22, 1964, there was a general discussion of the investigation which was being made into the affairs of the Association. Because of the presence of press at the meeting and the confidential nature of the Dugan and Kendrick reports, the directors of the Association resolved that the membership should be fully informed of all aspects of the investigation at district meetings, which would be held in the spring of 1964. It was resolved that a report on the discount of the Embassy Dairy note would also be made at these meetings.

In the spring of 1964 Merrigan prepared a 43-page summary of the Dugan Report and an 18-page summary of the *entire* Embassy transaction. These reports were read to the membership at the district meetings; in some instances, by the director from the particular district and in other instances by Merrigan himself. A full discussion of the matters contained in the reports took place at these meetings.

In respect of the Harrison purchase the chancellor had this to say:

"The evidence shows here clearly, unequivocally recognized, of course, by the Association directors then, by everyone now, a clear conflict of interest in the acquisition by Mr. Hooper and Mr. Robinson of the plant in Florida and the incorporation of it under the name of Harrison Dairy. This was a conflict of interest which was brought to the attention of Mr. Remsberg in August of 1961.

"We think it important to point out at the outset of this episode that at that time the directors were not aware of the transactions with reference to 'phantom brokerage' through the use of this corporate entity which came to light during the Dugan investigation in late 1963 and 1964. At this particular time Mr. Homer Remsberg, the then president, considered that there was indeed, when it was brought to his attention, a conflict of interest and he remarked, 'This cannot be.'

"It has been urged upon the court that certain actions should have been taken much sooner than they were. The record does show in this case that Mr. Remsberg, after talking with Mr. Gladhill of this county [Montgomery], whom he referred to as 'one of our most responsible directors,' then took it up at the next meeting of the board of directors. It was determined that something should be done immediately. And the record shows the appointment of a committee including at least two members of the Executive Committee to make a trip to Florida to examine the Harrison facilities.

"The Plant Committee had a meeting down there in Florida and their minutes are in the record. There was thereafter a meeting of the

board of directors in Arlington, at which time the question of acquisition of Harrison was considered."

Commenting on the Click charges the chancellor found "that the board acted very responsibly at that time in the face of a festering problem in the corporate family * * *." He continued:

"What they did at that juncture—and how it was done—was critical to the future of the Association. They chose at that time to have a confidential fact-finding investigation by Professor Dugan of Georgetown University Law School, a person described in this record as one of the most renowned men in the country in that specialty, certainly a man of great eminence and integrity.

"The evidence in this case shows abundantly that there was complete cooperation between Professor Dugan and the defendant directors, that they gave him carte blanche, the only restriction being that he was not to interview a competitor; the Association would make all of the books and records available, all directors would be made available.

"Mr. Robinson did appear more than once, we recall three times, and without counsel. Mr. Hooper fully cooperated. Professor Dugan made a complete and confidential report, public disclosure of which would have been unnecessary and ill-advised."

## THE ALLEGED CONSPIRACY TO CONCEAL

The chancellor adopted also the proposed finding of fact in regard to the alleged conspiracy to color and falsify information furnished to the members of the association or to conceal and withhold it from the members. The

finding adopted by the chancellor, slightly edited, is as follows.

There is no evidence of any conversation, discussion or request on the part of any defendant director, any Association employee, the defendants Hooper and Robinson, or the defendant Kendrick, wherein any of said parties suggested or requested that any one of said persons or any other person, conspire together to conceal, withhold, color or falsify any information regarding any transaction of the Association from the members of the Association. Nor is there any evidence that any of said persons or combination of persons at any time did in fact conceal, withhold, color or falsify from or to the membership any relevant information in connection with any transaction involving the affairs of the Association.

The members of the Association were at all times fully and adequately apprised of all relevant information regarding the Association's operation through various publications of the Association, including the monthly newsletter and the financial statements prepared by the auditor and published in the annual report which was printed and circulated to the entire membership. Each year an annual meeting was held wherein financial and general operating reports were made to the members by the president and the secretary-treasurer-general manager. Local district meetings, attended by at least one member of the board of directors and representatives of the Association management, were also held to keep the members informed on market conditions and Association operations.

There is no evidence that in any of said publications or at any of said meetings information

to which the members were entitled was at any time concealed or misrepresented.

Within a reasonable time after the Dugan investigation had been completed, a 43-page summary of Dean Dugan's report was prepared and read to all interested members at district meetings specifically called for this purpose. And at the same meeting, an 18-page report fully explaining the history of the Embassy acquisition, sale, and discount on the purchase note was also read and fully explained to the members.

The chancellor thought the case had been ably tried and appellants' counsel conceded they had indeed enjoyed "a full and open hearing." We agree on both counts. It occurs to us, however, that the appellants, in many instances, seem to have lost sight of the fact that what we said in *Parish* was based entirely upon the allegations in their voluminous bill of complaint and not upon evidence. At trial they elected to provide most of that evidence through the testimony of a number of the defendants (appellees), including Remsberg, Hooper and Kendrick, and employees Click and Snyder, all of whom were clearly adverse witnesses, and by the testimony of Merrigan and Clifford who, while perhaps not adverse in the statutory sense, Code (1965 Repl. Vol.), Art. 35, § 9, could hardly be called friendly. Mrs. Parish, Wharff and Wenger were the only appellants who gave testimony. A vast quantity of documentary evidence found its way into the transcript. Robert M. Goldman, Esq., executor and quondam attorney for Robinson, gave testimony on behalf of Robinson's estate. The deposition of Col. Hughes was admitted. It was stipulated that Dean Dugan, if called, would testify that the Robinson and Hooper releases "were fair and justified and were in the best interest of the Association." It was stipulated also that each of the directors who did not give testimony would say, if called, that he did not, at any time, have a conversation with Wayne Kendrick or any other person in

respect of "the submission of false or misleading information to the Association membership or the concealment of material information from the Association membership." The appellants are bound by most of the testimony, *Callahan v. Reynolds*, 254 Md. 625 (1969), and in respect of the remainder very little, if any of it, seems to have been rebutted, contradicted or discredited. Appellants contend, of course, that the evidence would support their own proposed findings of fact. We express no opinion in this regard but it can hardly be doubted that even if the evidence could be said to support the findings of fact they have proposed it also supports the findings made by the chancellor and our examination of this long and tedious record has fully persuaded us that his judgment in this regard was not clearly erroneous. Indeed we cannot recall a single finding of fact which has been challenged by the appellants as being clearly erroneous. This leads us to the question whether the chancellor applied the proper standard of care in his appraisal of the conduct of the directors.

## THE CONCLUSIONS OF LAW

The standard to be applied depends, in most instances, on the relationship of the parties. Scott, in his treatise, V Scott, *Law of Trusts* § 495, 3534 (3d ed. 1967), puts it this way:

> "We have considered elsewhere the principles which are applicable in the case of express trustees. Similar principles are applicable to other fiduciaries. Such other fiduciaries include guardians, executors and administrators, agents, attorneys, partners, joint adventurers, directors and officers of corporations. Each of these owes a duty of loyalty to the persons to whom he is in a fiduciary relation, and if in violation of his duty of loyalty to them he seeks to acquire or retain for himself some property interest, he

is chargeable as constructive trustee for them. *It is to be noticed, however, that the extent of the duty of loyalty is not necessarily the same in all fiduciary relations, and what constitutes a violation of duty by one kind of fiduciary does not necessarily constitute a violation of duty by another kind of fiduciary.* The duty of loyalty owed by a trustee to his beneficiaries, for example, ordinarily is more intense than that owed by an agent to his principal, *or that owed by a corporate director to the corporation.*" (Emphasis added.)

The appellants, on the other hand, insist that "the Association is an express trustee of its members' milk and the proceeds thereof and that its directors and managing officers [having] shared the trust obligation of the Association with respect thereto * * * are held to a higher standard than that of directors of the ordinary business corporation, which is not a trustee handling other people's money and property." In dealing with the question whether the appellants lacked standing to maintain this action the chancellor thought there was a "fiduciary relationship subsisting between the members and the Association as a result of the consignment to the Association of their produce." But, he said, "the Cooperative Code provisions [Code (1966 Repl. Vol.), Art. 23, § 349] are cast in the mold of the corporation law of the State of Maryland." He continued:

"* * * We do not think that the simon-pure relationship that governs between cestui que trust and trustees are necessarily imported into the relationship that subsists between the Association and its members. See *Scott on Trusts,* Volume Five, Section 495, at page 3534.

"In other words, we think there is a fiduciary relationship which gives these former members a right to maintain this action, but we, never-

theless, find and hold that the standard applicable to the directors upon the Bill of Complaint of the complainants in this case is the same standard as would apply generally with respect to the officers and directors of a stock corporation or a commercial organization which is a corporate entity. That standard we are all familiar with namely, that *such officers and directors are liable for gross and culpable negligence.* [Emphasis added.]

"The familiar provisions, also, we think, of corporation law would obtain here with respect to the right or not of a court to intervene in the internal affairs of a corporate organization."

We think the chancellor has stated quite accurately the standard against which the conduct of the directors must be measured. In *Parish,* Judge Barnes said, for the Court:

"It is well established that courts generally will not interfere with the internal management of a corporation at the request of a minority stockholder or a member. The conduct of the corporation's affairs are placed in the hands of the board of directors and if the majority of the board properly exercises its business judgment, the directors are not ordinarily liable. This sound general rule, however, is subject to the important exception that directors *will be held liable* if they permit the funds of the corporation or the corporate property to be lost or wasted *by their gross or culpable negligence.*" 250 Md. at 74. (Second emphasis added.)

To the same effect *see Coffman v. Maryland Publ. Co.,* 167 Md. 275 (1934) ; *Burkhart v. Smith,* 161 Md. 398 (1932) ; *Securities and Exchange Comm'n v. Chenery Corp.,* 318 U. S. 80, 85-86 (1943) ; Henn, *Law of Corporation* § 235 (2d ed. 1970).

The chancellor concluded that the purchase of Embassy amounted neither to gross negligence nor culpable mismanagement on the part of the directors. We agree. They had good and sufficient reasons for making the business decision to acquire Embassy. They obtained appraisals from competent and independent appraisers. They sought and received the advice of eminent counsel of whose expertise there is little doubt. It is a fact, as we see it, that the purchase of Embassy was far from being a disaster. It returned a profit of over $5,000,000 during the five and one-half years it was owned by the Association and even after the divestiture ordered by the Supreme Court it continued to be a substantial buyer of the Association's milk. The chancellor commented that the "matters [concerning the purchase of Embassy] were carefully considered." He continued:

> "The financing was arranged through the Baltimore Bank of Cooperatives. The Department of Agriculture supported the acquisition of Embassy. One thousand members of the Association participated in [the] financing of it by their subscriptions. The Association's agents and representatives at district meetings of the Association throughout the various districts presented to the members of the Association the facts with reference to the acquisition and the method of financing, as they later did with the Dugan Report."

It seems fair to say that if the Embassy purchase were the only basis for the appellants' complaint this suit would never have been filed.

In respect of the purchase of the Richfield stock the chancellor said:

> "* * * [A]s to the business judgments exercised by the defendant directors, it appears to the court that at the time they made this acquisition, while we may now debate its wisdom, on

the basis of the facts as they appeared to them, this cannot be said to be a grossly and culpably negligent decision for them to have made. They made it at a price which was not an unreasonable price. They made it at a time when the customers of that particular dairy represented a substantial segment of the market. To them undoubtedly it seemed that this was, especially in the light of the fact that the company was in debt substantially to the Association, that this was conceivably a way of protecting themselves in acquiring not only a dairy and its customers but also its physical properties. This was not an indiscreet or unwise decision. We may quarrel with it now many years after the fact, but the court cannot say as a matter of fact or certainly as a matter of law that the acquisition of Richfield-Wakefield was a mistake of negligent or grossly negligent proportions."

We agree. The chancellor might also have pointed out that Richfield had been marketing about $5,000,000 worth of milk annually, 80 percent of which came from the Association, and that for $375,000 the Association was able to acquire a facility which, it was said, would have cost in excess of $2,500,000 to build and develop. There was also the alarming possibility that Richfield might be snapped up by one of the national dairies that had expressed an interest in it. We think the directors were justified in relying upon counsel's opinion that the purchase would be unobjectionable from an antitrust standpoint since it "was primarily a salvage operation designed to prevent a very substantial loss" and was not part of a program of development or expansion. The chancellor did not discuss appellants' objection to the "write-off" of the Richfield stock but as we see it there was no need for him to do so.

Considering the fact, as the chancellor found, that the sale of Embassy resulted in a gain of $465,794.41 to the

Association and the fact that the Supreme Court's decision left the directors no choice but to sell (within a year) it is difficult to categorize the action of the directors in doing so as grossly negligent or to say that what they did amounted to culpable mismanagement. Indeed it becomes impossible to do so when one considers that the purchase price (less the $500,000 discount) was paid in full and that the Association continued to sell much of its milk to Embassy. The appellants contend that the failure to pursue Philipson's intimation of a $4,000,000 offer was reprehensible but we do not see it quite that way. The identity of the principal was not disclosed and the details of the proposal were not revealed. An important factor was the expectation that Embassy would continue to buy milk from the Association. Berger assured the Association that it would continue to be Embassy's principal source of supply. The chancellor found as a fact that the assurance given by Berger was honored and that, as of 5 January 1970, Embassy continued as a customer. Such an assurance from an undisclosed source would seem to us to have had little meaning. As the chancellor pointed out "[t]here were others, similarly unidentified, and there were the employees * * * of the Embassy Division who had not the means to finance such a purchase." "It seems," he observed, "that they [the directors] did everything they responsibly could do." While it all might have been done differently, perhaps even more advantageously to the Association, nevertheless we see nothing in the way of gross negligence or culpable mismanagement.

In respect of the discount allowed Berger the appellants speak of it as a "loss" of $500,000, a view neither we nor the chancellor would seem to share. It is beyond dispute that Berger's companies made prompt and full payment of all obligations due the Association arising out of their purchase of Embassy. Nevertheless the news that Berger had sold Embassy to Southland Corporation was disturbing despite Berger's great wealth and the

fact that Southland (owner of the Seven-Eleven stores) was a very responsible company. The Association naturally wanted to be paid in full out of the millions in cash coming into Berger's possession but Berger took the position that his companies had never defaulted, that he was under no obligation to anticipate payment, and that in the future the Association could expect to be paid on the nail. He did, however, indicate a willingness to prepay if the Association would give him a discount of $1,-000,000. Negotiations in this regard ended in an agreement to pay $500,000, the amount of the final payment due 12 years hence. At the time Embassy was buying $7,000,000 worth of the Association's milk each year. The directors also compared the value of the immediate payment of $2,300,000 to the payment of $2,800,000 over a period of 12 years. The result of their calculations in this regard is not clear but there is no doubt there was much soul-searching before the final decision was reached. The appellee Giles H. Miller, Jr., was, at or about that time, president of the Virginia Bankers Association and, according to Merrigan, at Miller's request "the top bankers in the whole State of Virginia went over this in the most thorough detail." Merrigan said other bankers had been consulted and that he himself had telephoned his brother, a bank president in Louisiana, who advised him "categorically that if * * * [the Association] could collect the $2,300,000 in '63 it would be better than waiting for $2,800,000 in 1975." The chancellor concluded, and we agree, that:

> "In the process, the Association came into possession at that time of cash money in excess of $2 million, as we recall it $2,200,000, with which to finance their operations. There is credible testimony in the record that by so doing they saved a substantial amount of interest in borrowings.
> "Overall, * * * the discount arrangement was an act of reasonable business judgment, debat-

able as such judgments are, but certainly not an act of negligence. It has been attacked for very cogent reasons, persuasively urged upon the court. Mr. Hooper, for example, said they should 'ride' with it, that he did not consider the discount 'necessary.' [5] Some of the directors may have held the same view. We do not recall the vote at this point, but a substantial majority of the board voted to approve the discount. In retrospect we think, and current events probably support the conclusion with high interest rates at the present time, that their decision was all-in-all a reasonable act of management."

An odd facet of the matter of the discount is the following footnote appearing on page 12 of the brief filed on behalf of the appellants Wharff and Wenger, the only appellants represented by counsel:

"Upon a careful review of the testimony, these Appellants have concluded that the allowance of the discount by the 1963 directors was a *prudent and necessary act required by the situation* brought about by the prior boards of directors, and have determined not to press any claim against the 1963 directors as such with respect thereto." (Emphasis added.)

We think the chancellor properly concluded that the directors exercised sound business judgment when they decided to purchase Harrison, and that the price paid was not excessive. Appellants argue that because Dean Dugan, *in 1964,* discovered and reported Robinson's perfidy in his operation of Harrison that the directors were guilty of gross and culpable negligence when they purchased it in 1961. Had they known in 1961 what they learned in 1964 there can be little doubt their course of

5. Hooper also said he thought the majority was "probably right."

action should and very likely would have been quite different. We agree with the chancellor's comment:

"It has been urged upon the court that this was a foolish and unwise thing to do, to purchase this facility because it was solely to get rid of a conflict of interest. There is some surface appeal to this argument. However, upon analysis, it appears to the court that there were other considerations involved which had to be taken into account, and we think it is a legitimate inference from the evidence that they were taken into account at that time.

"The evidence before us as to the Florida market establishes that it was not inconsequential by any means, but rather an important market that the Association had been selling to previously through Galloway West, an organization that was taken over by Borden's. Mr. Hooper's testimony disclosed to the court the importance of this market and the difficulty of getting in there because of permit restrictions.

"At the time the board had before it for consideration the decision of what to do about Harrison, the alternatives would include, perhaps, the sale of it to a competitor, not a wise thing to do. Or the sale of it to some outside party. In either eventuality, the Association would lose its foothold in Florida.

"We cannot say at this juncture that their decision, which we think was really a two-fold one, to get rid of the conflict of interest and to pick up a facility comparable to others we have heard of in this record, a facility that could be of value to the Association, was an unwise or negligent action."

\* \* \*

"The directors who testified on the stand with reference to this [the price paid] gave their

opinion that at that time it was considered to be a going concern worth more than its book value, and it was on this basis that it was purchased and merged into the Fluid Division.

"The court cannot say, on the basis of the record before us, that this was an unwise thing to do at that particular moment and that the directors were grossly and culpably negligent for so doing."

As the chancellor said "[t]he conflict of interest was indeed plain, but the true proportions of it did not come to light" until November 1963 when Click submitted his resignation and accused Hooper and Robinson of assorted skulduggery. As we have said, the chancellor concluded the board acted "very responsibly" in the employment of Dean Dugan whose qualifications in this regard have already been stated. The directors can hardly be censured for this decision.

When Dean Dugan reported the results of his investigation and Kendrick's audit to the directors Hooper's resignation was requested. When he refused to resign he was discharged. Robinson's contract had not been renewed after it expired on 31 December 1963. Merrigan and Dugan were thereupon directed to recover from Hooper and Robinson whatever monies might be due the Association. For the moment we shall defer our discussion of the settlements made with Hooper and Robinson.

We think the findings of fact in respect of a conspiracy to conceal or withhold information make it clear that these charges are not supported by the evidence. And since the charges appear to be aimed chiefly at Kendrick a brief comment seems in order. Kendrick was produced as a witness by the appellants. He testified that his work was consistent with good, sound, standard accounting procedures, that his reports were delivered by him to the directors, and that he had nothing to do with their distribution to the members. His testimony stands unrebutted and uncontradicted. *Callahan v. Reynolds,*

254 Md. 625, 629 (1969). The appellants have produced no testimony, expert or otherwise, that any of Kendrick's reports were in any way incorrect, improper, false, misleading or that they were not prepared in accordance with sound accounting practices and procedures. We join in the chancellor's belief that

"* * * this is a man of substantial integrity and we do not find that the evidence in this case sustains the contention that there was any conspiracy on his part to conceal, misrepresent, or defraud or in any way do anything other than follow sound accounting principles and practices."

We shall now revert to the contentions made in respect of the settlements with Hooper and Robinson and the releases executed pursuant thereto. In this regard one must be mindful of the fact that the question now before us is not quite the same question that was before us in *Parish*. On 6 November 1969, during the course of the trial on the merits, the appellants abandoned the following subparagraphs of the bill: 18(a), charging Robinson with acquiring large tracts of unneeded land near Laurel and selling them to the Association at a substantial profit; 18(b), charging Robinson with acquiring a milk plant near Laurel and selling it to the Association at a "large and unconscionable profit" to himself; 18(f), charging Robinson with requiring Association products to be hauled in trucks owned by him; 18(h), charging Robinson with employing inexperienced and incompetent relatives of himself and Hooper in positions of trust at the Laurel plant and elsewhere. The Dugan report was not before us in *Parish* nor were we aware of the results of the investigations made by Merrigan and Kendrick along the lines suggested by Dean Dugan in his report. Absent also was the uncontradicted testimony that Kendrick had seen both sides of all transactions involving the sale by the Association of milk products to either

Mutual Milk Sales, Inc., or Mutual Milk Sales Packaging Division, Inc., and the fact that no other sales of dairy products were made by the Association to any other corporation with which Robinson had any connection.

The release to Robinson and Hooper entitled "General Release" has the usual general release verbiage, after which the following language appears:

> "* * * including, but in no respect limited to, any matter, cause or thing whatsoever growing out of (a) the purchase by the Party of the First Part from the Parties of the Second Part of the stock in Harrison Dairy Products, Inc., (b) the agreement of April 12, 1962 by and between the Party of the First Part and the Parties of the Second Part regarding the purchase and sale of the said stock in Harrison Dairy Products, Inc., and (c) certain claims of the Party of the First Part against Arthur V. Robinson, Mutual Milk Sales Inc. and/or Mutual Milk Sales Packaging Division, Inc., and/or William B. Hooper in the sum of approximately $235,000; it being fully understood and agreed however, that the payment and releases set forth hereinabove, being part and parcel of an amicable settlement voluntarily tendered of all outstanding claims among the parties named hereinabove, in no respect evidence or constitute admissions or concessions of legal liability or wrongdoing on the part of any of the parties hereto."

The directors, after a full explanation by counsel on 14 March 1964, approved the releases from the Association to Robinson and Hooper and from them to the Association. They were executed on 30, 31 March and 1 April.

The applicable principles of law were stated by Judge Barnes, for the Court, in *Parish*:

> "* * * Ordinarily a defense based upon a release is complete. A release, however, is a con-

tract and may be set aside for the same reasons for which any other contract may be avoided. *Thomas v. Erie Insurance Exchange,* 229 Md. 332, 182 A. 2d 823 (1962). If the release is obtained by fraud, it may be set aside for this reason. *Spitze v. B & O Railroad Co.,* 75 Md. 162, 23 A. 307 (1892). In addition to actual fraud, which is not alleged in the complaint, when the release is challenged, a party to it who stands in a confidential relationship to the other party has the burden of showing that the release was not obtained by fraud, undue influence or over-reaching. See *Indurated Concrete Corp. v. Abbott,* 195 Md. 496, 74 A. 2d 17 (1950).

"In our opinion the complaint alleges sufficient facts to indicate, *prima facie,* that Robinson, as well as Hooper, did stand in a confidential relationship to the Association and they have the burden of establishing that the general release given by the Association to them in 1964 was not obtained by their fraud, undue influence or over-reaching. It may be that either Robinson or Hooper, or both, may be able to allege in their answers and prove at the trial of the case on the merits that the general release was obtained in an arms-length transaction, untainted by fraud, undue influence or over-reaching on their part and when the Association had, or should have had, a full and complete knowledge of the relevant facts concerning the matter, but the burden of showing all of this is upon Robinson and Hooper." *Id.* at 101-102.

Perhaps, at this point, one ought to recall the distinction between "burden of proof" and "burden of evidence" or as it is usually called, "the burden of going forward with the evidence." The burden of proof, i.e., the risk of non-persuasion, never shifts from the party on whom it is placed. The burden of going forward with the evi-

dence may shift during the course of the trial. *Operations Research, Inc. v. Davidson & Talbird, Inc.*, 241 Md. 550, 574 (1966). But it should be observed that the burden of proof is satisfied by the actual proof of the facts which need to be proved, *regardless of which party introduces the evidence. Blacher v. National Bank of Baltimore*, 151 Md. 514, 523 (1926) ; 31A C.J.S. *Evidence* § 104, 176 (1964) ; 29 Am.Jur.2d, *Evidence* § 127 (1967).

It is abundantly clear that the "general release was obtained in an arms-length transaction." Both Robinson and Hooper were represented by competent and aggressive counsel; the Association was represented by Merrigan and Dean Dugan. It was said that during the negotiations, which went on for some six weeks, there "were very acrimonious discussions." We have not been shown, nor have we found, any evidence suggesting there was a taint of "fraud, undue influence or overreaching" on the part of Robinson or Hooper. The directors seem to have relied exclusively on Dugan's transcript and report, the documents compiled by Dugan and Kendrick, the additional investigations made by Merrigan and the employees, and upon the advice of counsel. There seems to be no doubt about the fact that the directors had "a full and complete knowledge of the relevant facts concerning the matter."

Appellants regard as both significant and important the further comment of Judge Barnes in *Parish* :

> "In short, under the facts and circumstances alleged and the reasonable inferences from those facts and circumstances, Robinson (as well as Hooper) has the burden of showing that the general release was fair, free from fraud, undue influence and over-reaching, and that the Association executed the general release with full knowledge of the applicable facts. By the facts appearing in exhibit G, already referred to above, it is clear that so far as Robinson is concerned, the Association did not receive the

Mutual books, demanded by the general counsel of the Association, prior to the execution by the Association of the general release. It thus appears, *prima facie*, that the Association did not in fact have full and complete knowledge of the amounts and details of Robinson's misconduct in the Mutual transaction at the time the general release was executed. It is clear from the authorities that a general release of a person standing in a fiduciary relation to a corporation does not release such a person even though the official relationship of that person to the corporation has been terminated in substantial time prior to the execution of the release. *There still must be a full and frank disclosure by the person in the fiduciary relationship in order to sustain the effectiveness of the release. Irving Trust Co. v. Deutsch,* 73 F. 2d 121 (2d Cir. 1934). See *Stevens v. Marco,* 147 Cal. App. 2d 357, 305 P. 2d 669, 684-85 (1956). *Cf. Hawker v. Worley,* 33 F. 2d 491 (8th Cir. 1929)." *Id.* at 104-105. (Emphasis added.)

The exact language used in "exhibit G," referred to by Judge Barnes, is as follows:

"The Association, through its General Counsel, Mr. Merrigan, formally requested Mr. Robinson to produce the books of [Mutual Sales and Mutual Packaging] to show exactly why a price differential or mark-up was allowed to Mutual, but while Mr. Robinson agreed to cooperate, he finally limited this production to sales invoices only. The books of the Mutual corporations were never produced."

Merrigan's letter (the formal request) of 7 January 1964, asked for "whatever purchase-sales records and books * * * might be available to show the picture at the other end of Mutual's purchases from the Laurel plant."

Two weeks later he renewed his request that Robinson "make available to Mr. Kendrick's representatives all of the *pertinent sales books and records* of" Mutual. (Emphasis added.)

It seems to us, as Robinson's executors argue, that Robinson did produce the records Merrigan asked him to make available. Merrigan, testifying at the trial, said, "* * * what we were interested in we got. We wanted the additional sales books and what we were interested in was trying to get the other end of the transactions with Mutual, which we got." The chancellor, as we have said, found as a fact that "Kendrick examined each sale on the Association's books and, also * * * [Mutual's] sales records which showed the other side of each transaction." Kendrick established a gross profit of $100,256.23 to Mutual—the same figure mentioned in the "exhibit G" in *Parish.* The chancellor also found as a fact that "no other sales of dairy products were made by the Association to any corporation with which Robinson had any connection" (except Harrison, of course). There is no evidence that any other books or records were thereafter requested or that access to them was refused by Robinson. Appellants, however, point to the following paragraph in Kendrick's letter of 6 February 1964 to Dean Dugan:

> "We requested copies of income tax returns and correspondence with Weldon Farm Products, Inc. The certified public accountants to whom we were referred advised that they had authority to permit us to examine the sales invoices mentioned above, but could not let us examine any other papers."

The accountants' caution is certainly understandable but, as we have said, it does not appear that a further request was submitted to Robinson or that he refused any such request. We think it is clear that the directors, their attorneys, and their accountants were completely satisfied,

in light of their own investigations, that the maximum amounts recoverable from Robinson were, in respect of Harrison, $135,529.67, and in respect of Mutual, $100,-256.23. These figures formed the principal basis for the Association's claim of $235,000 against both Robinson and Hooper and, it will be recalled, all claims arising out of Harrison and Mutual were specifically released.

Appellants still insist that "a full and frank" disclosure has not been made by Robinson and that therefore the release is ineffective. We certainly did not intend, in *Parish*, to create the impression that a "full and frank disclosure" would be meaningless unless made by the releasee personally. As long as the releasee can demonstrate to the trier of facts that a "full and frank disclosure" of all relevant, pertinent and significant facts and circumstances has been made to the releasor it would seem not to matter that they were elicited from sources other than the releasee himself. The releasee, of course, cannot escape from the burden of proving the arms-length transaction, the absence of fraud, undue influence or over-reaching and the releasor's knowledge of all relevant facts. *Parish* at 101-102.

Considering the wide latitude given to the appellants in their extensive and unlimited pretrial discovery procedures and their careful resifting at trial of every aspect of the Association's investigation before the settlement and the execution of the releases, it is indeed extraordinary that they have been unable to point to a single *relevant* fact withheld or concealed by Robinson or about which the directors had no knowledge. We think it is clear, on this record, that the directors had all the information they needed, all they wanted and quite likely all that mattered.[6] Counsel (Merrigan and Dean Dugan)

---

6. Merrigan's statement, elicited during the trial, seems especially significant in this context:

"Q. Let me ask you this, then, sir: Do you presently know of any other claims that can be asserted against either Mr. Hooper or Robinson that were not released by the releases executed April 1, 1964? A. The answer to that is no, I know of no other claims against Hooper and Robin-

gave them in great detail both sides of the settlement question. They emphasized that

> "[a]micable, private settlement of these conflicting claims continues to avoid adverse publicity for all concerned, which, in and of itself is of inestimable value to an Association doing $40,000,000 worth of business in this area of the United States. It also eliminates any further internal disruptions, and the Association can go about its business during a very difficult period without the constant distraction of bitter litigations, with nasty side effects."

Counsel concluded by stating:

> "The board must weigh the value of a full amicable settlement of the existing claims, with the concomitant avoidance of litigation, against the uncertainties here involved. Bear in mind, however, that no additional *specific* claims are presently assertable or known. If any exist, they would *possibly* come to light only after (a) completion of a physical appraisal at Laurel, (b) further fact finding and audits, (c) further testimony. Not only will the last two mentioned items be costly, but they will be more difficult than ever to pursue now that the Robinson family is no longer employed at Laurel, and it is doubtful that any would cooperate, as in the past, in testimony or in producing books and records of their outside operations."

The chancellor held, in respect of the "narrow question" as to whether Robinson's estate and Hooper might avail themselves of the release, "— based upon all the

---

son that weren't covered by that release. I have searched my mind on this subject all during this trial and litigation as to what could have been done differently, and taking into mind everything I knew then and now and consider all of the facts and circumstances and the cost of litigation and the answer is absolutely no. If I had it to do over again today I would do it the same way as we did it then after five years of litigation."

evidence here—that they can and that this release bars the claim against them." We agree and it should be obvious that if the release is sustainable as to Robinson's estate then a fortiori the same is true as to Hooper.

We have been urged, rather strongly, by the appellees to decide whether the appellants have standing to sue the directors or Robinson's estate and Hooper but we shall not extend this seemingly endless opinion with a discussion of those troublesome questions simply because a decision is not required.

Neither is it necessary for us to decide whether the chancellor erred in dismissing Frank Parish as a party to the suit. Even if we were to say that his dismissal was not justified the result reached here would be no different.

We are mindful of the fact that there are a number of subsidiary contentions, arguments, petitions, and motions which have not been decided, discussed or mentioned. That they have not been dealt with means only we have thought it unnecessary to do so, not that they have been overlooked or ignored.

The appellants Wharff and Wenger, in their Reply Brief, have suggested a "general scheme of relief" premised, of course, on our reversal of the chancellor's decree. In their supplemental brief counsel for the Association point out, rather bitterly to be sure, that "this litigation has already cost the Association and its members some $200,000 to defend and considering that appellants now propose to saddle the Association with all of their costs and fees * * *, how much, we ask, would the Association have to recover in this case *just to break even?"* This brings to mind the resolution unanimously adopted by the 1969 annual meeting of the members of the Association, a part of which is set forth below:

> "WHEREAS, Messrs. Parish, Wharff and Wenger, persons who are no longer members of this Association, are continuing to maintain and press what they describe as a 'membership action' or derivative action brought for the bene-

fit. of the members here of this Association against the Association and its directors and former directors; and

"WHEREAS, the defense of that action has already caused the Association to lose more than $100,000 in legal fees and court costs and threatens to saddle the Association with additional costs and losses which must be borne by its members and no part of which can be currently assessed against Mr. Parish or Mr. Wenger because they are not members of the Association; and

"WHEREAS, the membership of the Association is completely satisfied with the management and financial condition of the Association and in no respect desires that the Parish lawsuit be continued or maintained for its alleged benefit in any form; and

"WHEREAS, the continuation of the said suit and the claims asserted therein are making it more and more difficult for the membership to find persons who are ready and willing to serve as directors of the Association;

"Now, THEREFORE, BE IT RESOLVED:

"(1) That the membership of this Association be recorded as absolutely opposed to the continuation of the suit brought by Messrs. Parish, Wharff and Wenger against the Association and its directors for the alleged benefit of all members of the Association.

"(2) That the membership itself take any and all actions available to it to terminate that lawsuit at the earliest possible date * * *."

Perhaps our decision here will bring this litigation to a conclusion. Thus endeth the lesson.

*Decree affirmed.*
*Costs to be paid by the appellants.*